# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2176

_____

| | | |
|---|---|---|
| K.E., by and through her parents, K.E. and T.E., | * | |
| | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Independent School District No. 15, St. Francis, Minnesota, | * | |
| | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: December 14, 2010
Filed: August 3, 2011

_____

Before LOKEN, ARNOLD, and BYE, Circuit Judges.

_____

ARNOLD, Circuit Judge.

K.E. is an eleven-year-old special education student who lives in Minnesota Independent School District No. 15 (the District). An administrative law judge for the Minnesota Department of Education determined that the District had denied K.E. a free appropriate public education (FAPE) within the meaning of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1482. After K.E. filed an action in federal district court seeking attorney fees and costs, both parties filed cross-

motions for judgment on the administrative record. The district court[1] reversed the ALJ's decision and denied K.E.'s motion for fees and costs, and K.E. appealed. We affirm.

I.

K.E. attended St. Francis Elementary School in the District during all times relevant to this case. Before K.E. enrolled there as a kindergartner, Dr. Jonathan Miller, a pediatric neuropsychologist, evaluated her based on reports that she had been suffering from severe mood swings and difficulties with hyperactivity, impulsivity, and a decreased attention span. At that time, K.E. had already been diagnosed with attention deficit hyperactivity disorder (ADHD), fetal alcohol syndrome, and disruptive behavior disorder. (She had also been given a diagnosis of bipolar disorder, but her treating physician, Dr. Gary Gronstedt, was in the process of ruling that diagnosis out.) Following his own evaluation, Dr. Miller confirmed the diagnosis of disruptive-behavior disorder, and further concluded that K.E. had non-specific forms of cognitive disorder and mood disorder. Testing also revealed that K.E.'s IQ was 82, which was low-average in range. Based on these results, Dr. Miller offered a number of recommendations for K.E., many of which were directed at aiding her performance at school.

As K.E. was completing first grade, the District conducted its own evaluation to determine whether she was eligible to receive funds for special education services. In the resulting report, the District noted K.E. had been diagnosed as having "mood disorder and ADHD" and that her mother (Parent) had reported a diagnosis of bipolar disorder as well. The evaluation then summarized reports that Parent and K.E.'s teachers had provided, all of which indicated that K.E. required assistance following directions, staying on task, and keeping organized. The reports also indicated that

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

K.E. performed below grade level in reading, writing, and math, and testing revealed that K.E.'s IQ was 78. Despite these difficulties, though, the District determined that K.E. was ineligible for special-education services because her file did not include a current DSM-IV diagnosis of a medical condition that would interfere with her academic performance or progress. Soon thereafter, Parent obtained a DSM-IV diagnosis that her daughter had ADHD, and K.E. was deemed eligible for special education services under the category "other health disabilities." Minn. R. 3235.1335 (2004). (DSM-IV is the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders.)

Upon K.E.'s becoming eligible for special education services, the District, by way of an individualized education program (IEP) team – which includes the child's parent, school teachers, and those with relevant expertise – created an initial IEP for K.E. *See* 20 U.S.C. § 1414(d) (1). This IEP established goals for K.E. in the areas of reading, writing, spelling, working independently, and social skills, and it specified various adaptations intended to assist her in those targeted areas. The next year, after K.E. had entered the third grade, the IEP team created a second IEP that included new goals for reading, spelling, and math; though it made slight changes to the goals in independent work and social skills, the adaptations remained substantially the same.

At the same time, Parent arranged for Dr. Richard Ziegler, a professor of pediatrics and neurology, to evaluate K.E. The results of this evaluation indicated that K.E. had below-average cognitive abilities, low-to-average skills in reading and math, and a significant impairment in written language. Many of these findings were consistent with the District's earlier evaluation, although Dr. Ziegler did note a significant decline in certain areas of K.E.'s cognitive functioning and academic skills for which he could provide no definite explanation. Dr. Ziegler stated that K.E.'s progress should be viewed in the "context of her complex psychiatric concerns": He suggested that any "general slowing or plateauing" of her academic abilities likely resulted from "her difficulty managing her behavior and following the flow of

information in the classroom," which, in turn, resulted from "psychiatric issues including mood disorder and ADHD." The doctor also noted that K.E.'s medications might be affecting her performance. To address these deficits, Dr. Ziegler recommended speech and language services and additional written language services, as well as small-group instructional time or paraprofessional support in the classroom.

After the District received a copy of Dr. Ziegler's evaluation, K.E.'s IEP team met to discuss its findings and recommendations. A speech and language clinician participated in the meeting specifically to address the recommendation concerning speech and language services. After discussing Dr. Ziegler's report in its entirety, the IEP team concluded that two significant changes to the adaptations section of K.E.'s IEP were appropriate: first, K.E. would have access to an educational assistant (EA) in the classroom (the record indicates no distinction between a "paraprofessional" (referred to by Dr. Ziegler) and an EA), and second, she would be allowed to take sensory breaks as needed. The IEP team determined, however, that K.E. did not need speech and language services. At the beginning of K.E.'s fourth-grade year, the IEP team made additional changes. Specifically, the team set new goals in the IEP for reading, spelling, and math but made little or no change in areas of independent work or social skills.

Shortly before K.E. finished fourth grade, the District completed a comprehensive three-year reevaluation of her that resulted in an eleven-page report. In the report, the District again referred to K.E.'s ADHD diagnosis, and it added that K.E., while hospitalized on an unspecified occasion, had been diagnosed with personality disorder and probable bipolar disorder. The reevaluation report included a finding that K.E.'s academic performance was low-average when compared to her peers, noting particular concern about her language-based learning abilities, and attached reports from her teachers indicated that she struggled with reading comprehension. The teachers' reports also noted that K.E. had difficulty sustaining attention, following directions, remaining quiet, working independently, completing

assignments, and staying organized, and that she often acted impulsively and lacked self-control.

As part of the reevaluation process, the District conducted a "sensory profile," which concluded that K.E. had difficulty processing sensory input and regulating her behavior in school due to its increased distractions and demands; to address these difficulties, the profile recommended that K.E. be given additional sensory input throughout the day and be allowed to take movement breaks as necessary. The District also conducted a "functional behavior assessment," which identified two of K.E.'s behaviors as requiring increased attention: blurting out and negative interactions with peers. Based on the assessment, the District created a behavioral intervention plan (BIP), which identified common triggers for the two targeted behaviors, as well as strategies that staff could use to reduce the likelihood that K.E. would engage in them. As a result of the reevaluation, the District changed K.E.'s listed disability from "other health disabilities" to "emotional or behavioral disorders with secondary other health disabilities." The stated reason for this change was K.E.'s diagnosis of personality disorder and probable bipolar disorder.

After the District completed the reevaluation report, the IEP team met to review the results and make changes to K.E.'s IEP. At that time, the team rewrote some of the IEP goals with greater specificity and incorporated the newly-created BIP into the IEP by reference. The team also included a variety of new adaptations for K.E. in the IEP, including access to sensory tools, supervision by an EA during lunch and recess, reading aloud of tests, the opportunity to redo assignments and retake tests for an improved grade, and occupational therapy. It was also at this meeting that Parent informed the IEP team that K.E. had recently been evaluated by Dr. Secan Unal, a psychiatric psychologist at the Mayo Clinic, and that Dr. Unal had diagnosed K.E. with bipolar disorder with psychotic traits. K.E. continued to be treated by Dr. Unal throughout the remaining months relevant to this case.

At the beginning of K.E.'s fifth-grade school year, Parent contacted the District to inquire about potential day treatment options for K.E. Jacqueline Stein, the director of special services for the District, discussed the available options with Parent, but Ms. Stein advised that an IEP team meeting would be necessary before any changes in K.E.'s placement were made. At Parent's urging, Dr. Unal then contacted the District to discuss the day-treatment issue, and she sent a follow-up letter, describing K.E.'s mental illness as a "severe psychopathology [that] presents with mood and thought disturbances" and one that is "episodic ... which impacts [K.E.'s] cognitive functioning, emotional regulation and behavioral control." Dr. Unal also stated that it was her impression that K.E. could "hardly read" and that she did not possess "appropriate skills in mathematics." Dr. Unal concluded the letter by offering a list of recommendations for K.E.'s fifth-grade year, including a close alliance between K.E.'s parents and District staff to monitor changes in K.E.'s mood, close observation and guidance to avoid problems in peer relationships, paraprofessional help during the school day, close supervision to monitor K.E.'s reaction to academic demands to avoid substantial mood episodes, academic instruction in small steps, additional time to complete assignments, adjustments in homework, assistance in narrowing down homework assignments and accurately translating them to her notebook, transition time for changes in activity or setting, and a method of alternative communication for K.E. to convey that she needed a break.

In late October and again in November of K.E.'s fifth-grade year, the District attempted to schedule an IEP team meeting to consider the possibility of day treatment for K.E. and to discuss Dr. Unal's recommendations. Parent cancelled both of these meetings, however, and the team did not meet until January. In the meantime, Parent filed a due process complaint and request for administrative hearing with the Minnesota Department of Education. When the IEP team meeting did take place, Parent and an attorney for K.E. abruptly left following a disagreement on how the meeting would proceed. After they left, the remaining members continued the meeting; they discussed Dr. Unal's recommendations and revised K.E.'s IEP to

provide more specific goals in the areas of writing, independent work, and social skills and additional adaptations. The team also determined that it would be appropriate to conduct a new evaluation of K.E. to develop current assessments of functional behavior and language. The District then sent K.E.'s Parent a proposed IEP, accompanying documentation, and a recording of the meeting, but Parent refused to consent to the changes or evaluation.

Shortly thereafter, prompted by what Dr. Unal described as worsening mood symptoms, K.E. was excused from school temporarily, and Dr. Unal wrote a letter to Ms. Stein providing additional information concerning K.E.'s status. In that letter, Dr. Unal stated that K.E. had suffered a recurrence of her bipolar disorder and was suffering from "pronounced racing of thoughts [and] deficits in sustaining attention," which affected her "working memory, goal directed behavior, emotional self-control, organization, and planning functions." To address these issues, Dr. Unal recommended a reduction in school hours and home-bound instruction, effective immediately, for two months. Ms. Stein immediately sent a written response to Dr. Unal, indicating that an IEP meeting would be necessary because a shortened school day would affect K.E.'s academic performance. Ms. Stein invited Dr. Unal to participate in that meeting, but if she could not participate, Ms. Stein asked Dr. Unal to explain her conclusions in more detail and state whether her recommendation for a shortened school day might change if the educators who worked with K.E. had not observed an increase in her symptoms.

After sending this letter to Dr. Unal, Ms. Stein urgently scheduled an IEP team meeting; at the request of Parent and counsel for K.E., the meeting was then rescheduled. But Parent and counsel for K.E. ultimately did not attend the rescheduled meeting, and, due to their absence, Dr. Unal declined to participate via telephone. The IEP team proceeded anyway, and they discussed Dr. Unal's recommendation for a reduction in school hours and K.E.'s recent behavior and academic performance. Although the team determined that a shortened school day

was not appropriate for K.E. at that time, they revised the IEP to incorporate additional accommodations focused on tracking K.E.'s emotional mood and providing her with a variety of sensory breaks. The social worker for the District also agreed to create additional coping strategies to assist staff when working with K.E. The District provided Parent with notes from the meeting, accompanying documentation, and a proposed IEP, but Parent did not consent to the revisions.

Dr. Unal then responded to Ms. Stein's letter and opined that Ms. Stein did not fully understand the severity of K.E.'s problems. Dr. Unal therefore proposed placing K.E. in either a day-care setting or a different school district with more resources and experience dealing with "highly disabled children." Ms. Stein soon wrote back, reiterating that the educators who worked with K.E. had not observed the same changes in mood and academic performance that served as the basis for Dr. Unal's recommendations. Ms. Stein also expressed her disappointment that Dr. Unal had failed to address her specific questions regarding the recommendation of a shortened school day, and she explained that the District could not satisfy its obligations under the IDEA "by simply acceding to a parental request or by blindly accepting another professional's conclusions and/or programming recommendations."

Parent then filed an amended due process complaint and request for administrative hearing that included additional requests for a shortened school day, transportation, and an appropriate therapeutic education. During a due process hearing that lasted nine days, the ALJ received testimony from K.E., Parent, members of the District staff, and Dr. Unal. Three expert witnesses also testified about the complexity of K.E.'s mental illness and the adequacy of the District's efforts to provide for K.E.'s education. The ALJ concluded that the District had failed to comply with several procedural requirements of the IDEA, and that the District's failure to conduct appropriate evaluations, to include the results of both outside and its own evaluations in K.E.'s IEPs, and to develop an appropriate IEP and BIP and revise them as necessary to address K.E.'s lack of progress, had denied her a FAPE

from December of K.E.'s second-grade school year until February of her fifth-grade year – the date that Parent filed the amended due process complaint. When the District appealed the ALJ's decision to the district court, the court granted the District's motion for judgment on the administrative record, concluding that the District had indeed provided K.E. with a FAPE. K.E. then filed this appeal.

## II.

K.E. contends that the district court failed to apply the correct standard of review because it did not afford the level of deference to the ALJ's findings and conclusion that the IDEA requires. But K.E. does not challenge any specific finding or conclusion made by the district court as erroneous for this reason, only the court's ultimate determination that K.E. had received a FAPE. And with respect to that conclusion, K.E.'s sole argument is that the decision was improper because it was "in direct contradiction [to] the opinion of the [ALJ] who heard the same evidence and is entitled to deference regarding credibility determinations and findings of fact." While we certainly agree with K.E. that the IDEA requires some limited deference, we reject her assertion that the district court failed to apply that level of deference here.

Under the IDEA, an aggrieved party may seek judicial review of a state administrative hearing decision in a federal district court. *See* 20 U.S.C. § 1415(i)(2)(A). The district court must then review the administrative record, hear additional evidence if requested, and "basing its decision on the preponderance of the evidence, ... grant such relief as [it] determines is appropriate." *Id.* at § 1415(i)(2)(C). In deciding whether the IDEA has been violated, the district court must "independently determine whether the child [in question] has received a FAPE." *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003), *cert. denied*, 540 U.S. 984 (2003). In doing so, the court must also give " 'due weight' to agency decision-making." *Id.* (quoting *Independent Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir 1996)). This somewhat "unusual" standard of review is less deferential than the substantial-evidence standard commonly applied in federal

administrative law. *Dist. No. 283*, 88 F.3d at 561. But we have recognized that this limited grant of deference – "due weight" – is appropriate in IDEA cases because the ALJ "had an opportunity to observe the demeanor of the witnesses and because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s]." *CJN*, 323 F.3d at 636 (internal quotation marks and citation omitted).

K.E. argues that the district court failed to give due weight to the results of the administrative hearing because it "impermissibly chose between [the views] of conflicting experts" when coming to its decision that K.E. had received a FAPE. Implicit in this argument, of course, is the premise that the ALJ also "chose" between these experts when making its decision, that is, it made a credibility determination regarding the testimony offered by the expert witnesses, to which the district court failed to defer. This characterization receives no support in the record, however, given that neither the ALJ nor the district court based any of their findings on credibility determinations concerning one expert versus that of another. To the contrary, the ALJ cited approvingly in its opinion to the testimony of all three of the experts who testified at the administrative hearing, and while the district court cited to only one of these three experts in its opinion, there is nothing in the record to indicate that it found any one of them to be more or less credible than did the ALJ.

The same is true with respect to the fact witnesses who testified at the administrative hearing. Both the ALJ and the district court cited selectively throughout their respective opinions to the testimony of these individuals. But again, there is nothing in the district court's opinion to indicate that it based any of its findings on a credibility determination regarding these witnesses that differed from that of the ALJ. In fact, on the two occasions where the ALJ did make an explicit finding that a witness had testified "credibly" regarding a particular issue, the district court either did not address that issue in its opinion (because the issue had not been appealed) or it agreed with the conclusion reached by the ALJ. The ALJ never made

an explicit finding that any witness had testified incredibly at the hearing, and the district court likewise gives no indication that it disbelieved any of the witnesses.

Despite K.E.'s assertions to the contrary, the district court was well aware of its limited authority, and in each instance where it disagreed with the ALJ, the court neither failed to defer to the ALJ's observations of the witnesses nor substituted its own notions of educational policy for those of trained educators. Rather, the court thoroughly reviewed the administrative record and determined that a preponderance of the evidence did not support the ALJ's conclusion. The district court did ultimately reach a different conclusion from the ALJ's as to whether the District provided K.E. with a FAPE. But that decision alone is wholly insufficient to show that the court somehow failed to apply the required level of deference. Whether a child has received a FAPE is a mixed question of law and fact. *CJN*, 323 F.3d at 637. Accordingly, when a district court examines this issue, it is "obligated to determine independently the legal significance of the [applicable] facts." *Cf. id.* at 636-37. That the district court here sided with the District means neither that it necessarily believed the testimony of the school authorities and its experts more than the ALJ did nor that the court's analysis was incorrect. Rather, it means only that the district court "reached a different conclusion based on [its own] understanding of the law." *Cf. id.* This was not a failure to give "due weight" to the results of the administrative hearing.

## III.

K.E. also maintains that the district court erred by failing to conclude that the District committed a variety of procedural violations of the IDEA. In particular, K.E. contends that the District denied Parent a meaningful opportunity to participate in the IEP process, that it failed to consider the results of outside evaluations, and that it developed IEPs for K.E. that were deficient in many respects.

When reviewing a school district's compliance with the IDEA, a district court must engage in a two-part inquiry: It must first determine whether the school district

-11-

followed the procedures set forth in the IDEA, and then it must decide whether the resulting IEP was "reasonably calculated to enable the child to receive educational benefit." *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982). "If these requirements are met, the [school district] has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207. (Although *Rowley* was decided under the IDEA's precursor (the Education of the Handicapped Act), its principles apply to IDEA decisions, *see, e.g., Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 424 (8th Cir. 2010)). As we have already said, whether a school district has provided a student with a FAPE is a mixed question of law and fact; we review the district court's ultimate determination *de novo*. *See School Bd. of Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1011 (8th Cir. 2006). But a district court's findings of fact are binding unless they are clearly erroneous. *Id.*

To satisfy the procedural requirements of the IDEA, a "school district must follow the procedures set forth in the [statute] to formulate an IEP tailored to meet the disabled child's unique needs." *Id.* at 1011. Congress intended that such procedures would guarantee "parents and guardians a large measure of participation" in the IEP process and would assure that the resulting IEP included "much if not all of what Congress wished in the way of substantive content." *Rowley,* 458 U.S. at 206-07. If a school district fails to comply with IDEA procedures, however, the IEPs that result from the violation are not necessarily invalid. *Renollett*, 440 F.3d at 1011. Rather, "[a]n IEP should be set aside only if [the] procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Id.* (internal citation omitted).

According to K.E., the District violated IDEA procedures by denying Parent a meaningful opportunity to participate in the IEP process. In particular, she asserts that the District gave inadequate notice to Parent of certain IEP team meetings, which Parent did not attend, *see* 34 C.F.R. § 300.322(a)(1) and (2), and that it failed to take

the necessary action to convince Parent that she should attend those meetings, *see id.* at § 300.322(d). K.E. also asserts that the District had already "predetermined" what educational programming would be provided to her before many IEP meetings, and that this predetermination denied Parent the opportunity to participate in the IEP process, *see* § 300.501(b), (c); *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004), *cert. denied*, 546 U.S. 936 (2005). The ALJ rejected these arguments, however, and we need not reach their merits given that K.E. failed to challenge those determinations before the district court and, in fact, asked that the district court uphold the ALJ's determinations. *See Schuldt v. Mankato Indep. Sch. Dist. No. 77*, 937 F.2d 1357, 1363 (8th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992). "It is a well settled rule that issues not raised in the trial court will not be considered on appeal except in exceptional cases where the obvious result would be a plain miscarriage of justice . . . or would be inconsistent with substantial justice." *Nolte v. Pearson*, 994 F.2d 1311, 1316 (8th Cir. 1993) (internal quotation marks and citations omitted). This is not such an exceptional case.

We similarly decline to address the merits of K.E.'s argument that the District violated her procedural rights because it failed to include assistive technology in her IEPs. The IDEA requires that a school district provide assistive technology if a child's IEP team determines that the child needs access to that technology in order to receive a FAPE. *See* 34 C.F.R. § 300.105; *see also* 20 U.S.C. § 1414(d)(3)(B)(v). K.E. contends that the District "never considered assistive technology" or conducted "assessments or evaluations" to determine whether such technology was appropriate, but the ALJ rejected a similar argument and K.E. did not raise the issue before the district court. Accordingly, we will not decide it as part of this appeal.

K.E. next contends that the District violated IDEA procedures by failing to consider outside evaluations when developing her IEPs. She also maintains that the District failed to meet with Parent to discuss the outside evaluations or the recommendations for K.E.'s educational programming that they contained. In

advancing these claims, K.E. focuses, for the most part, on the evaluation and recommendations offered by Dr. Unal. She also asserts more broadly, however, that the District failed to provide Parent with the opportunity to attend any IEP meeting at which time "all salient requests and recommendations were discussed."

Under the IDEA, an IEP team must "consider" the results of evaluations when developing an IEP. 20 U.S.C. § 1414(d)(3)(A)(iii). The district court found that the District satisfied that obligation with respect to the outside evaluations conducted by Dr.'s Miller and Ziegler, and we agree with that conclusion. In particular, we find it persuasive that the District incorporated many of the recommendations offered by Dr.'s Miller and Ziegler into K.E.'s IEPs. *See G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 947 (1st Cir. 1991). We also note the testimony of K.E.'s special education teacher and case manager for third-grade, who stated that the IEP team considered "all" of Dr. Ziegler's recommendations at a March, 2007, IEP team meeting and made the "significant change" to add EA support to K.E.'s IEP because "it was one of the recommendations [made] in [that] outside evaluation." K.E.'s special education teacher and case manager for the fourth grade testified similarly with respect to an IEP team meeting that took place the next year, and her notes from that meeting, as well, reflect that the team had considered Dr. Ziegler's evaluation. It is true that the District did not incorporate into K.E.'s IEPs *all* of the recommendations that Dr.'s Miller and Ziegler offered in their respective evaluations. But the IDEA requires only that an IEP team "consider," not "incorporate," such evaluations when developing an IEP, *see* 20 U.S.C. § 1414(d)(3)(A)(iii), and the record shows that the District satisfied that requirement here.

The record is equally clear that the District also considered the evaluation and recommendations of Dr. Unal. In coming to a similar conclusion, the district court relied heavily on the testimony of IEP team members, who stated that they "considered, took into account, and accommodated the reported *mood and bipolar disorders*" that Dr. Unal had diagnosed. Meeting notes from an IEP team meeting in February of

-14-

K.E.'s fifth-grade year lend further support to this testimony, as they indicate that the "agenda" for that meeting included reviewing the "request for a shortened school day" and "discussion and consideration" of the "recommendations made by Dr. Unal." The notes also contain a detailed account of the discussions that the IEP team had on those topics, and they show that the team attempted to contact Dr. Unal via telephone during the meeting in the hope that she would agree to participate in those conversations.

That Parent decided not to attend that meeting is not the District's fault. In fact, the record shows that the District attempted to schedule four different IEP team meetings – the first time in September of K.E.'s fifth-grade school year and then in the months that followed – to discuss Dr. Unal's recommendations. Parent or counsel for K.E. cancelled two of these meetings, they walked out of the January meeting over a dispute about the agenda, and they decided simply not to attend the meeting in February. Parent also refused to approve two proposed IEPs that the team developed during the January and February meetings, both of which incorporated many of Dr. Unal's recommendations. Where a parent has "truncated [her] own procedural right to contribute to the development of [a child's] IEP," a school district "cannot be faulted for failing to engage in an open discussion." *Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 657 (8th Cir. 1999). The record is clear in this case that it was Parent, not the District, who refused to participate in the IEP process, and thus any failure to engage in a more "open discussion" about Dr. Unal's evaluation and recommendations belongs with Parent, and Parent alone. *See id.*

Finally, K.E. argues that the District violated IDEA procedures by creating IEPs that were deficient in various respects. In so arguing, however, K.E. reasserts many of the arguments that she brought unsuccessfully before the district court. As we agree with the district court's well-reasoned disposition of these issues in all relevant respects, we undertake only a limited discussion of them.

K.E. first maintains that her IEPs were deficient because they failed to set forth her deficits in organizational skills and explain how they affected her academic achievement and functional performance. Under the IDEA, an IEP must include a statement of "how the child's disability affects the child's involvement and progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa). K.E.'s IEPs addressed her deficits in organizational skills mainly with respect to a goal designed to improve her independent work skills in the areas of "organization, time management, [and] following directions." As part of that goal, K.E.'s IEPs explained that she had been diagnosed with both fetal alcohol effect and ADHD, and that those disabilities commonly cause challenges in the areas of "attention, organization, retention of skills/information, generalization, following directions, cause and effect relationships, social interactions, and the ability to refrain from impulsive behavior." The IEPs then stated that K.E. suffered "significant disability" in several of those identified areas, including retaining information day-to-day, rushing through school work, following directions, and being organized and staying on task. The IEPs added that K.E.'s difficulties in those areas caused her to require "excessive staff assistance" and one-to-one "repeated directions and guidance." Sections of the IEP that discussed other goals similarly explained how K.E.'s deficits in organizational skills affected her performance in other academic subjects as well, including the fact that K.E. struggled with organizing sentences and paragraphs (writing-and-spelling-skills goal) and that she had difficulty determining which steps to follow when solving math story problems (math-skills goal). All of these statements are more than sufficient to explain how K.E.'s organizational deficits affected her ability to learn.

K.E. next contends that her IEPs were deficient because they failed to state annual goals intended to meet her needs and permit her to make progress in the general curriculum, and that the District failed to make IEP revisions to allow her to make that progress. Under the IDEA, an IEP must include "a statement of measurable annual goals, including academic and functional goals" that is "designed to" meet the needs resulting from the child's disability so that the child can "be involved in and make

progress in the general education curriculum" and "meet each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II). A school district also must revise an IEP as is "appropriate to address ... any lack of expected progress toward the annual goals and in the general education curriculum," "the results of any reevaluation," or information about the child provided by the parents. *Id.* at § 1414(d)(4)(A)(ii).

K.E. argues that her annual goals violated these requirements because she made "no demonstrable progress" in the area of organizational skills. As the district court rightly noted, however, to reach that conclusion it would have to ignore completely evidence that K.E. progressed in the areas of reading, spelling, and math. Where "the record indicates that a student's behavioral problems, if unattended, might significantly curtail [her] ability to learn, the fact that [she] is learning is significant evidence that [those] behavioral problems have, at least, in part, been attended to." *CJN*, 323 F.3d at 642. Here, K.E.'s IEPs stated that her deficits in organizational skills significantly impeded her ability to learn, and thus her progress in other academic areas strongly suggests that the annual goals with respect to organizational skills were more than adequate to meet her needs. *See id.* Furthermore, the record clearly shows that the District revised K.E.'s IEPs when she failed to reach those goals. For example, in the IEP prepared at the end of K.E.'s fourth-grade year, the District added two new objectives to improve K.E.'s ability to use sensory tools to increase her focus and attention span, and it incorporated the use of sensory breaks as an adaptation to assist in achieving that result. The District also incorporated into that IEP the newly-created BIP, which included various additional adaptations also intended to assist K.E. with her organizational skills, including preferential seating in the classroom, checking for clarification with respect to academic tasks, and the opportunity to work in an alternative room with fewer distractions. Given these revisions, then, and the progress that K.E. was able to achieve, we do not conclude that the District provided inadequate annual goals for K.E. or that it failed to revise them as necessary.

-17-

K.E. asserts that her IEPs were deficient because they failed to provide proper adaptations to address her bipolar disorder. In particular, she contends that the District "completely disregarded this substantial health disorder" in that it developed IEPs that provided "no therapeutic services to address her mental health needs." K.E. does not specify what "therapeutic services" the IEPs failed to provide, but we note that the ALJ found that the District denied K.E. a FAPE, in part, because it did not give her necessary psychological and social work services, including monitoring her sleep patterns, her behaviors observed by Parent, changes in medication, external stressors, and responses to educational programming. Accordingly, since the district court rejected the ALJ's decision on that conclusion, we assume that those are the sorts of services to which K.E. intends to call our attention and which she contends should have been provided because of her bipolar disorder.

An IEP must set out the "special education and related services" that will be provided in order to allow the child to make progress toward the IEPs annual goals and in the general education curriculum. 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Both psychological and social work services that are needed to help a child "benefit from special education" qualify as "related services" under § 1401(26)(A). As the district court correctly noted, however, when the District developed K.E.'s IEPs it had received contradictory information about whether K.E. suffered from bipolar disorder. The District also did not yet have the benefit of Dr. Unal's testimony from the administrative hearing concerning the severity and complexity of K.E.'s mental illness and the psychological and social work services that might be necessary for the District to monitor and address it. For those reasons, while we may agree with K.E. that additional services and adaptations may well be warranted now in light of the information that Dr. Unal has provided, it would be improper for us to judge K.E.'s IEPs in hindsight. *See Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990), *cert. denied*, 499 U.S. 912 (1991); *see also CJN*, 323 F.3d at 638-39. "An IEP is a snapshot, not a retrospective," and we must "take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP

was promulgated." *Roland M.*, 910 F.2d at 992. Using that frame of reference, we do not conclude that K.E.'s IEPs were deficient because they lacked the services and adaptations that she now contends are necessary.

K.E. further maintains that her IEPs were deficient because they failed to incorporate many of the adaptations and supports that the District implemented as part of her educational programming. In particular, K.E. contends that her IEPs failed to set forth the "extensive modifications" that her teachers used when they assigned her schoolwork and that they lacked specificity about the District's use of EA staff to assist K.E., including the frequency, location, and duration of that support. Like she did in district court, however, K.E. cites no authority for the proposition that a school district violates the IDEA if it does not set forth every detail about every adaptation that could provide a child with an educational benefit. We have held, moreover, that an IEP must provide only "sufficient specialized services" to enable a student to benefit from her education, and it need not be designed either to "maximize a student's potential or provide the best possible education at public expense." *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 612 (8th Cir. 1997), *cert. denied*, 523 U.S. 1137 (1998); *see also CJN*, 323 F.3d at 638-39. Because K.E.'s IEPs included specialized services that were sufficient to enable her to achieve academic progress, we conclude that they were not deficient for failing to provide additional specificity regarding the adaptations that the District did provide. *See Renollett*, 440 F.3d at 1011.

## IV.

K.E. also argues that the district court erred by failing to conclude that the District violated the IDEA's substantive requirement, that is, it denied her a FAPE. To provide a child with a "free appropriate public education," a school district must give her "access to specialized instruction and related services" that are "individually designed" to provide "some educational benefit." *Rowley*, 458 U.S. at 200-01. Whether a child can "achieve passing marks and advance from grade to grade" are both "important factor[s]" when determining whether a school district has developed an IEP

that is "reasonably calculated" to satisfy the IDEA substantive requirement. *Id.* at 202-04; *see also CJN*, 323 F.3d at 642. But academic progress alone does not mean that a child has received a FAPE, particularly when that child suffers from a behavioral disability. *See CJN*, 323 F.3d at 642. Rather, we must judge each IEP on whether it is "responsive to the student's specific disabilities, whether academic or behavioral." *Id.*

K.E. contends that the District failed to provide her with a FAPE because she did not make "adequate progress" academically during the relevant time period. As evidence of this lack of progress, K.E. contends that she failed to meet her IEP goals with respect to writing skills and that she regressed in her ability to read. She also asserts that standardized testing revealed that she was "losing ground" academically in all areas as compared to her peers, and she argues that the District failed to provide her with adequate educational programming to enable her to overcome, or at least reduce, this widening gap.

The record, however, does not support this characterization of K.E.'s academic progress. To the contrary, as the district court explained, K.E.'s progress reports between the fall of her third-grade year and the end of fourth grade, show that she made significant progress in reading, spelling, and math. For example, K.E. progressed in reading from decoding only the most basic of consonant-vowel-consonant words to decoding 5-6 letter words containing digraphs – two letters combined to form one sound ("sh" in shout) – and blends – two letters combined with each retaining a sound ("st" in stand). She also advanced in her reading fluency, improving from a second-grade reading level at 34 words per minute to a fourth-grade level at 54 words per minute. K.E.'s ability to spell, as reflected in her weekly spelling tests, similarly increased, and in math, she progressed from telling time to the half-hour, reading names on coins, and performing one-digit addition and subtraction problems, to telling time to the minute, counting change up to two dollars, performing 3-digit addition and subtraction problems, and skip-counting by 2, 5, and 10. And

standardized test results for K.E. showed her improvement in math, reading, and language usage, as well.

We acknowledge that K.E. did fail to meet some of her IEP goals during the relevant time period. We also recognize that K.E.'s test results do not demonstrate the level of growth that is typical for children of her grade level. But these shortcomings do not in any way negate the substantial progress that she was able to achieve, and furthermore, we have held that an IEP "need not be designed to maximize a student's potential commensurate with the opportunity provided to other children. The requirements are satisfied when a school district provides individualized education and services sufficient to provide disabled children with some educational benefit," and K.E.'s academic progress clearly shows that she did receive that required level of educational benefit. *M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 461 (8th Cir. 2008) (internal quotation marks and citations omitted), *cert. denied*, 129 S. Ct. 452 (2008).

K.E. also maintains that the District denied her a FAPE because it failed adequately to address her behavioral disabilities. Under the IDEA, an IEP team must, "in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). And when a team fails to take this sort of action, that failure can amount to a substantive denial of the child's FAPE. *See Neosho R-V Sch. Dist.*, 315 F.3d at 1028-29. We concluded that a substantive violation occurred in *Neosho* after the district court conducted an independent review and found that the IEP team failed to adopt or implement anything that would be "sufficient to amount to a cohesive behavioral management plan," and the record showed that the child made only "slight" or "de minimis academic and social progress" and that any educational benefit that the child did receive was then "lost due to [the] behavior problems that went unchecked." *Id.* at 1029.

These circumstances are not present in this case. For example, the District did create a "cohesive behavioral management plan" for K.E. when it conducted a functional behavioral assessment and, based on that assessment, developed the BIP. The District then adopted and implemented that plan when it incorporated the BIP into K.E.'s IEPs. It is true that experts for both K.E. and the District testified at the administrative hearing that the assessment and BIP were deficient in some respects; but given that K.E. enjoyed more than what we would consider "slight" or "de minimis" academic progress, we cannot conclude that those deficiencies denied K.E. the benefit of her educational programming. Rather, we agree with the district court that "[d]espite the severity of her mental illness and the changes in her medical treatment, K.E. made progress with respect to reading, spelling, and math, received passing grades in her classes, advanced from grade to grade, and demonstrated growth on standardized tests" during the time period when the ALJ had concluded that she was denied a FAPE. And for those reasons, we reject K.E.'s assertion that her behavioral problems were not sufficiently controlled and prohibited her from receiving a FAPE. *See CJN*, 323 F3d at 642-43.

K.E. argues lastly that the District denied her a FAPE because it failed to provide her with EA support in the classroom as two of the IEPs required. Even though the District has never denied this, the district court concluded that this failure did not deny K.E. a FAPE because EA support was not a "significant provision of the IEP." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 587 (5th Cir. 2009). In so concluding, the court reasoned that "[w]hether a provision is significant is determined in part based on whether the services provided actually conferred an educational benefit." *See id.* Since we agree with this reasoning, and we have found that K.E.'s educational programming did provide her with an educational benefit despite the absence of EA support in the classroom during her fourth and fifth grade years, we conclude, as did the district court, that the District's failure to provide this service did not amount to a substantive denial of a FAPE.

V.

Accordingly, we affirm the judgment of the district court.

BYE, Circuit Judge, dissenting in part.

The administrative law judge, who presided over the hearing on K.E.'s claim she was denied free access to public education (FAPE) within the meaning of the Individuals with Disabilities Education Act (IDEA), concluded the School District failed to address K.E.'s education-impeding behavioral challenges in her individualized education plan (IEP), thus preventing K.E. from receiving any meaningful educational benefit and denying her FAPE. I agree with the ALJ, and in reaching this conclusion, I suggest this court should be providing due weight to the administrative decision, not providing deference to the findings and decision of the district court. While I agree with the majority on several of the issues raised in this appeal, I cannot agree with the majority's decision as to whether the district court afforded due weight to the ALJ and its ultimate conclusion as to whether K.E. made sufficient progress during her second-, third-, fourth-, and fifth-grade years to demonstrate she received some educational benefit. I dissent in part because I would conclude the district court failed to give due weight to the administrative proceedings and, based on an independent review of those proceedings, I would further conclude the record establishes K.E. was denied FAPE.

I

I do not agree with the majority affording deference to the district court on factual findings. Ante at 12. There are two levels of review following an administrative hearing on claims under the IDEA. First, the district court should make an independent determination of the issues based on a "preponderance of the evidence," giving the administrative proceedings "due weight." Hendrick Hudson Dist. Bd. of Ed. v. Rowley, 458 U.S. 176, 206 (1982)). "[The] district court must give consideration 'to the fact that the state hearing panel has had the opportunity to observe

-23-

the demeanor of the witnesses,'" Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 654-55 (8th Cir. 1999) (quoting Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 610 (8th Cir. 1997)), and should be careful not to "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]," because the district court lacks the "specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Rowley, 458 U.S. at 206, 208 (internal quotation marks and citations omitted).

After the district court has reviewed the administrative proceedings as to whether a school district offered FAPE, we treat the district court's decision as a mixed question of law and fact and review it de novo. C.B. ex rel. B.B. v. Special Sch. Dist. No. 1, Minneapolis, Minn., 636 F.3d 981, 988-89 (8th Cir. 2011); Fort Zumwalt, 119 F.3d at 611. There are some cases which, like the majority's opinion, provide a level of deference to the district court indicating, unless there is a mistake of law, "the district court's answer to this mixed fact/law question is reviewed for clear error." E.S. v. Indep. Sch. Dist., No. 196, 135 F.3d 566, 569 (8th Cir. 1998) (citing Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1374 (8th Cir. 1996)); accord Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1035 (8th Cir. 2000); Blackmon, 198 F.3d at 655; see also Mary T. v. Sch. Dist. of Phila., 575 F.3d 235, 241-42 (3d Cir. 2009) (indicating on appeal from a state administrative decision under IDEA the appellate court reviews the district court's factual findings for clear error); N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1207 (9th Cir. 2008) ("We review the district court's findings of fact for clear error even when they are based on the written record of administrative proceedings."). I would recognize these differing standards as an intracircuit split of authority, which I would resolve by choosing the "better approach." See, e.g., United States v. LeBrun, 363 F.3d 715, 719 (8th Cir. 2004); Toua Hong Chang v. Minnesota, 521 F.3d 828, 832 n.3 (8th Cir. 2008) (citation omitted) ("When there is an intra-circuit split, we are free to choose which line of cases to follow."); but see Williams v. Nat'l Football League, 598 F.3d 932, 933-35 (8th Cir. 2009) (Colloton, J., dissenting from

denial of rehearing en banc) (pointing out that other circuits have concluded the better practice normally is to follow the earliest opinion).

It stands to reason providing any deference to the district court in this context, in which the district court reviews an administrative decision based only on a written administrative record, seems misplaced. The district court is in no better position than an appellate court reviewing a written administrative record to make its independent judgment. It is the administrative tribunal, not the district court, which takes evidence, hears witness testimony first-hand, and judges credibility. See Blackmon, 198 F.3d at 654-55 (recognizing it is "'the state hearing panel [who] has had the opportunity to observe the demeanor of the witnesses'") (quoting Fort Zumwalt, 119 F.3d at 611). Thus, the district court is in no better position than is this court in reviewing the record and resolving the issues. We have implied this much when defining the standard of review in cases of similar procedural structure where the district court essentially acts as the first level of appellate review. As an example, in social security cases it is well settled our review of the district court's decision is de novo. Martise v. Astrue, 641 F.3d 909, 920-21 (8th Cir. 2011). We provide no deference to the district court, but instead focus on the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. Buckner v. Astrue, — F.3d —, 2011 WL 2803017 at *6 (8th Cir. July 19, 2011). Similarly, on appeal from a bankruptcy matter, we review the district court's decision de novo, providing deference to the factual findings of the bankruptcy court, which heard the witnesses and took evidence in the first instance. Advanced Control Solutions, Inc. v. Justice, 639 F.3d 838, 840 (8th Cir. 2011) ("[W]e sit as a second court of review in bankruptcy matters, reviewing interpretations of law de novo, factual findings by the bankruptcy court for clear error, and matters committed to the bankruptcy court's discretion for an abuse of discretion."); In re Reynolds, 425 F.3d 526, 531 (8th Cir. 2005) ("[T]his court sits as a second court of review; we therefore apply the same standards of review to the bankruptcy court's decision as the district court does.").

-25-

In fact, in the Eighth Circuit, the deferential standard was first applied to our review of a district court's decision on an IDEA claim in Yankton School District v. Schramm, which states "[a] district court's findings of fact must be upheld unless clearly erroneous." 93 F.3d at 1374. However, Yankton, appears to have applied this deferential standard without explanation, citing Light v. Parkway C-2 School District, 41 F.3d 1223, 1229 (8th Cir. 1994). Notably, Light was a distinctly different type of case in which parents filed suit directly to the district court challenging the suspension from school of their handicapped child as a result of the child's violent behavior. Id. at 1226. The district court heard testimony first-hand and made its factual determinations based on its own observation of the witnesses and evidence. Id. Consequently, on appeal, we deferred to the findings of the district court, reviewing only for clear error. Id. at 1229. Unlike Light, the district court in Yankton, as well as in the present case, did not preside over the trial, take evidence, or hear and observe witnesses first-hand. 93 F.3d at 1372. As a result, it seems Yankton may have improvidently applied this deferential standard to a case where it is not appropriate. In my opinion, I see no reason to defer to the district court, particularly when the decision of the ALJ—who did hear witnesses and take evidence—is merely afforded "due weight." Instead, I would follow the more logical de novo standard when reviewing a district court's decision in a case such as this one. See, e.g., C.B., 636 F.3d at 989 ("We review the district court's decision de novo."); T.F. v. Special Sch. Dist. of St. Louis County, 449 F.3d 816, 818 (8th Cir. 2006) (reviewing the district court's decision de novo, giving "due weight to the outcome of the administrative proceedings") (internal quotation marks and citation omitted).

The application of a deferential standard in some IDEA cases may be appropriate where the district court hears additional evidence under 20 U.S.C. § 1415(i)(2)(C)(ii). See Lorenzen v. Montgomery County Bd. of Edu., 403 F. App'x 832, 835 n.5 (4th Cir. 2010) (unpublished) ("In appeals under IDEA we generally conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings. However our cases also indicated that when a district

court hears additional evidence in an IDEA proceeding . . ., we apply a clear error standard of review.") (internal citations omitted). However, the district court's decision in this case was premised only on a review of the written record. And, where a district court's decision is based solely on a written record, I would not afford any deference to its factual findings. I instead suggest this court review the district court's decision under the more appropriate de novo standard, standing in essentially the same position as the district court, "render[ing] an independent decision based on a preponderance of the evidence in the administrative record, . . . giv[ing] 'due weight' to the results of the administrative proceedings and not substitut[ing] its 'own notions of sound educational policy for those of the school authorities which they review.'" C.B., 636 F.3d at 988-89 (quoting Rowley, 458 U.S. at 205-06).

II

Having concluded our review is deferential to the ALJ and not the district court, I next turn to the issue at hand: whether K.E. was denied FAPE. The district court determined the School District provided FAPE to K.E., and the majority affirms. In reaching this conclusion, both the district court and the majority reason the School District developed IEPs adequately addressing K.E.'s unique needs and K.E. received some educational benefit. However, these determinations stand in stark contrast to the findings and conclusions of the ALJ, which I find to be supported by a preponderance of the evidence and therefore entitled to due weight. See Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1028 (8th Cir. 2003) (affirming the district court's deference to the administrative panel's decision where the record supported the decision). In giving those findings and conclusions due weight, I conclude the IEPs failed to adequately address K.E.'s needs, inadequately defined necessary services, and were not properly implemented. As a result, K.E. was denied any meaningful educational benefit and, accordingly, was denied FAPE. I would therefore reverse the district court in part, and reinstate the ALJ's decision on this issue.

The School District had an obligation to create an IEP reasonably calculated to provide educational benefit to K.E. See Rowley, 458 U.S. at 203. "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense." Fort Zumwalt, 119 F.3d at 612 (citing Rowley, 458 U.S. at 203). IDEA is intended, instead, to "open the door of public education to handicapped children on appropriate terms." Rowley, 458 U.S. at 192. This court has held the School District need only provide the student with "'some educational benefit' and need not give her the best education possible." Blackmon, 198 F.3d at 660 (quoting Rowley, 458 U.S. at 200). However, the United States Supreme Court has qualified the educational benefit must be "meaningful." Rowley, 458 U.S. at 192. A student receives FAPE if the education (1) addresses the student's unique needs, (2) provides adequate support services to allow the student to take advantage of the educational opportunities, and (3) is in accord with the individualized education program. See Rowley, 458 U.S. at 188-89 (defining FAPE as "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction . . . [and] such instruction and services . . . comport with the child's IEP"); see also Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 893 (9th Cir. 1995). I conclude the School District failed to meet any of these three requirements, and address them each in turn.

A

First, a school district is required to develop an IEP addressing the unique needs of a given child. E.S., 135 F.3d at 569 (holding IDEA requires schools to "provide a 'free appropriate public education' to all of its disabled students by formulating IEPs tailored to their unique needs") (quoting 20 U.S.C. § 1412). A school district is not required to identify a student's issues by name or official diagnosis so long as the IEP properly identifies and addresses the student's disability. See, e.g., Pachl ex rel. Pachl v. Seagren, 373 F. Supp. 2d 969, 975 (D. Minn. 2005); see also Cronkite ex rel.

Cronkite v. Long Beach Unified Sch. Dist., No 97-55544, 1999 WL 196544, at *1 (9th Cir. Apr. 1, 1999) (unpublished); O'Dell v. Special Sch. Dist. of St. Louis County, 503 F.Supp.2d 1206 (E.D. Mo. 2007).  Notably, behavioral issues constitute a unique need which may negate academic progress if left unattended by an IEP or behavioral intervention plan.  See Neosho, 315 F.3d at 1029-30.  According to the ALJ, the School District failed to address many of K.E.'s unique needs because it failed to provide adequate goals and adaptations addressing K.E.'s behavioral issues.

The ALJ made several findings to support such a conclusion.  Beginning with the School District's evaluation in the spring of 2005—K.E.'s first-grade year—the reports indicated K.E. needed repeated directions, shortened assignments, visual prompts, additional time for assignments and tests, seating with minimal distractions, and assistance with organization.  The School District determined K.E. was not eligible for special education services at the time because she lacked a qualifying medical diagnosis, but in October 2005, once a diagnosis of ADHD was received, K.E. did qualify for services.  Thereafter, an IEP was developed to deal not only with K.E.'s below-grade-level academic performance, but also to work on her independent work and social skills.  Once K.E. qualified for special education services, the School District recognized various behavioral challenges in the years to follow in progress reports, teacher evaluations, and a functional behavior assessment.  Beginning in third grade, evaluations from K.E.'s doctors, which were reviewed by the School District, indicated K.E. had an impaired ability to follow directions, initiate tasks, manage and organize classroom materials and complete academic tasks in reading, writing and math.  Even more, one report indicated K.E. suffered from bipolar disorder and articulated the consequent behavioral challenges.  Despite the School District having reviewed this report, the behavioral challenges were unaddressed in K.E.'s IEPs.  As the ALJ found, the School District made "no acknowledgment that [K.E.'s] mental health could affect her ability to perform, and no expression of the need to monitor her mental health."  Administrative Findings ¶¶ 21, 25, Appellant's Add. at 8-9.  The IEP failed to include any services based on K.E.'s inability to consistently understand cues,

-29-

follow instruction, process information, or comprehend social interactions. As the ALJ found, "[w]ith the exception of the alternate work setting, there were no adaptations or strategies to help the Student concentrate on her work or modulate her behavior, even though each of those issues was identified in the Evaluation Report." Administrative Findings ¶¶ 22, 24, Appellant's Add. at 8-9.

K.E.'s inability to focus in class and be organized persisted in the following years. Behavior logs from 2007 indicated K.E. regularly failed to bring required materials to class, homework was often missing, and behavior logs were lost. K.E. also engaged in disruptive behavior. These issues were minimized on the rare occasion K.E. was assisted one-on-one by a paraprofessional/educational assistant ("EA"), as was reported by K.E.'s classroom instructors, but otherwise were repeated on a regular basis. Without assistance, K.E. often felt overwhelmed or frustrated and had to leave class or move to a less distracting portion of the room. She was unable to focus on any one task for more than a few minutes. In 2007, K.E. also experienced an overall regression in writing and spelling, yet no changes were made to address K.E.'s poor progress or to consider regularly providing one-on-one EA support despite the marked improvements made on the few occasions when one was made available. Then, in reports from 2008, K.E.'s instructors consistently indicated K.E. had difficulty sustaining attention, following directions, remaining quiet, working independently, completing assignments and staying organized. K.E. appeared to be impulsive, lacking self-control, and would shut down if given a reading or writing assignment. She continued to forget to bring materials to class and she also had difficulty with peers. One teacher indicated she felt K.E.'s inappropriate behavior was increasing and was interfering with her education. K.E. even described the 2007-2008 school year as miserable because she often could not function at school. Yet, despite the lack of progress on improving or mitigating K.E.'s behavioral challenges under the former and existing IEPs, nothing was changed.

Even after receiving a formal diagnosis for bipolar disorder in the spring of 2008, the School District made minuscule changes to the IEP. The disability was updated from "Other Health Disabilities" to "Emotional or Behavior Disorder," and the IEP better reflected K.E.'s ongoing academic challenges. Yet, the functional skills goals remained the same with no changes to improve her independent work skills. The IEP did call for access to an EA within the regular classroom, but did not describe the manner or time for the EA support. Further, the IEP did not address any additional services to be offered based on this new diagnosis, or strategies to keep K.E. focused in class, remain quiet, work independently, complete assignments, stay organized, or maintain self-control.

More than one-half of a year after the School District received K.E.'s formal diagnosis, the behavioral issues still persisted with little change to K.E.'s IEP. In January 2009, the classroom instructor noted K.E. still found assignments difficult, she could not study for tests independently, and she had to be given modified assignments and tests. She could not focus on one thing for more than a few minutes, refused to do work she thought would be too difficult, and continued to blurt out and interrupt class.

Throughout K.E.'s time in the elementary school, her IEPs failed to address these behavior issues. As the ALJ found, "[w]ith the exception of the alternate work setting, there were no adaptations or strategies to help the Student concentrate on her work or modulate her behavior, even though each of those issues was identified in the Evaluation Report." Administrative Findings ¶ 24, Appellant's Add. at 8-9. The adaptations offered in the IEPs were for sensory breaks, repeating instructions, preferential seating, and other in-class techniques for regaining K.E.'s attention once it was lost. However, these techniques proved to be inadequate as the IEPs and progress reports repeatedly noted no improvement in her independent work skills, organization, or classroom behavior. In April 2008, after the School District was formally notified of the bipolar diagnosis, it did develop a behavioral intervention plan to incorporate into K.E.'s IEP, but the plan only "responded" to bad behavior, failing

to develop methods for avoiding the problematic behavior in the first instance. The plan proposed use of the "1, 2, 3, Magic" technique which is essentially a system of warnings, and used positive rewards for good behavior, tracking behavior using behavior logs. Specifically, the focus of the behavior intervention plan was to deal with verbal disruptions in class, negative verbal interactions with peers, and physical aggression toward peers. It did not adequately address the education-impeding behaviors which prevented K.E. from focusing in class and often causing her to need to leave the room.

These techniques were insufficient, particularly when considering that, as the hearing testimony established, a child with a mood disorder like K.E. cannot control her behavior or appreciate the consequences of bad behavior. As a result, warning and reward systems will not assist K.E. with her behavioral challenges. Yet, the IEPs and behavioral intervention plan focused on warning and reward systems, failing to provide strategies to help K.E. avoid misbehavior from the beginning. They did not include strategies for a teacher to follow when presenting a lesson in order to keep K.E. focused or to verify she understood the lesson or instructions. Nor was there any strategy to increase sensory stimuli in order to keep K.E.'s attention and help decrease her disruptive behaviors. Further, when independent work began, there were no strategies to ensure K.E. knew what tasks she should be accomplishing and to help her remain focused and organized so she did not become disruptive and could remain in the classroom for as long as possible. Without a plan to avoid a downward behavioral spiral before it started, K.E. often struggled with being attentive in class and her only remaining method of recovery from such bouts of bad behavior was to take breaks.

Even with these failures in K.E.'s education plan, the district court found the IEPs and behavioral intervention plan to be adequate. The crux of the district court's determination was its conclusion the School District was not aware of K.E.'s bipolar disorder because it had only received contradictory information as to whether K.E. actually suffered from the disorder at the time the education plans were developed, and

the School District could only act on the information available at the time the IEPs were created. Consequently, according to the district court, because the School District only learned of K.E.'s bipolar disorder in 2007 and did not receive a formal diagnosis until 2008, it was not obligated to address the disorder in her IEPs. The majority has adopted this conclusion of the district court. Such a reading of the record leads me to a contrary result, one which is in accord with the ALJ's findings and conclusions.

The School District did not receive a formal diagnosis before the spring of 2008; however, prior to such time, the School District was provided several reports—starting with Dr. Miller's in 2005—indicating K.E. had been diagnosed with bipolar disorder. Also, K.E.'s Parent informed the school on several occasions of K.E.'s bipolar diagnosis, as recorded in K.E.'s 2005 evaluation. During her second-grade year, K.E. was hospitalized for mental disorder, about which the school was made aware. In the beginning of her third-grade year, the school nurse received a medical order for medication administration which clearly indicated K.E. was taking the medicine because she had been diagnosed as bipolar. And in 2007, Dr. Ziegler's report, which was discussed at an IEP meeting, noted K.E.'s diagnosis of bipolar disorder. Jacqueline Stein, Director of Special Services for the School District, even admitted awareness of the bipolar diagnosis in 2007 based on Dr. Ziegler's report. Thus, the record clearly establishes by a preponderance of the evidence the School District was informed of K.E.'s bipolar disorder early in her education, supporting the ALJ's finding the School District knew of K.E.'s condition and should have accounted for it in her IEPs and behavior intervention plan.

Even more, as the School District admits in briefing, it is not the formal diagnosis which determines the make-up of the IEP; it is the child's unique needs. See Rowley, 458 U.S. at 188-89; Appellant's Br. at 25. Both Dr. Miller's and Dr. Ziegler's reports provided in-depth descriptions of K.E.'s symptoms, including lack of ability to focus, behave, stay engaged in class, and be organized. As detailed above, many of the behavioral concerns attributed to bipolar disorder were observed and documented

-33-

in K.E.'s progress reports and IEPs yet were left unaddressed. Thus, regardless of whether the School District had a formal diagnosis, it was fully aware of K.E.'s unique needs created by the disorder. Yet, the School District failed to adequately address them. Consequently, regardless of whether the School District was cognizant of K.E.'s bipolar diagnosis before 2008, it was aware of her education-impeding behavioral challenges and failed to address them in her IEP and behavioral intervention plan. In my opinion, this failure deprived K.E. of a significant educational benefit.

B

I would next conclude in addition to failing to account for K.E.'s behavior issues in the IEPs, the School District also failed to provide necessary psychological and social work services to monitor K.E.'s mental health and address issues arising from the cyclical nature of bipolar disorder. Under IDEA law, an IEP must include "a statement of the special education and related services . . . to be provided to the child . . . to advance appropriately toward attaining the annual goals" and "to be involved in and make progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Psychological services and social work services are included in such related services "as may be required to assist a child with a disability to benefit from special education." Id. § 1401(26)(A).

K.E. contended the School District failed to provide her with these services, and the ALJ agreed. The School District disagrees suggesting it could not have provided any of these extra services because it had not received a formal diagnosis at the time the disputed IEPs were created. It is recognized an IEP cannot be judged "exclusively in hindsight" because the court "must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990). However, giving due weight to the findings of the ALJ, and consistent with the discussion contained in the previous section, the School District was aware of K.E.'s

-34-

bipolar diagnosis and likewise aware her mood disorder affected her ability to focus, behave, and become educated. The School District could have informed K.E.'s parents it required a formal diagnosis to address K.E.'s unique needs, however, it did not.

The record establishes K.E.'s mood dysregulation was a common issue both inside the classroom and during unstructured free time. The School District was aware from as early as K.E.'s second-grade year the positive behavior incentives and the warning systems were not improving K.E.'s behavior. Even without the advantage of hindsight, at a minimum, the School District should have considered psychological and social work services after receiving Dr. Ziegler's report in 2007—the end of K.E.'s third-grade year—in which Dr. Ziegler identified education-impeding behavioral issues attributable to her mood disorder. It did not, and I would conclude the School District's failure to provide, or at least consider, such services interfered with K.E.'s ability to take advantage of the educational opportunities.

Additionally, as the ALJ found, the School District failed to provide K.E. necessary paraprofessional ("EA") services. In reversing the ALJ, the district court concluded such services were not necessary because the classroom teacher was able to provide the needed one-on-one attention to K.E. to permit her to learn regardless. However, based on an independent review of the record, I would conclude otherwise. The lack of an EA often resulted in K.E. shutting down and declining to participate any time the classes involved reading and writing or unstructured time. Even more, when K.E. was in the classroom, she needed to be seated near the teacher, needed directions repeated, and needed someone to constantly keep her on track. When the teacher was unable to do this, K.E. would act out, not respond to warnings, and have to take a break—leaving class and losing education time. Progress reports showed this occurred two times a day on average. K.E.'s ability to learn was significantly impeded by her inability to focus. As the ALJ found, and the School District's own records and teacher feedback established, one-on-one work with an EA would have helped to correct the

issue. Without such assistance, K.E. was denied the opportunity to receive any meaningful educational benefit.

## C

Finally, the School District failed to fully implement the terms of the IEP. Even though the IEP included an EA in some environments during the fourth- and fifth-grade years, an EA was not provided. The ALJ determined this was a substantive violation of the IEP and it denied FAPE to K.E. The fact an EA was not provided was undisputed. Accordingly, this too contributes to the School District's failure to provide FAPE.

In sum, I would conclude the School District failed to address each of K.E.'s unique needs resulting from her bipolar disorder, failed to provide adequate support for K.E.'s psychological needs and in-class needs, and failed to comply with the IEP as developed. Accordingly, I would hold K.E.'s IEP was not reasonably calculated to provide, nor did the implementation of the IEP actually provide, K.E. any meaningful educational benefit.

## III

Nevertheless, the majority holds K.E. was not denied FAPE because, regardless of any less than adequate plans, denial of special education services, and failure to provide an EA as listed in the IEP, K.E. made sufficient academic progress. The majority rejects K.E.'s contention she did not make "adequate progress" academically, concluding "[t]he record . . . does not support this characterization of K.E.'s academic progress." Ante at 20. According to the majority, the record shows K.E. "made significant progress in reading, spelling, and math." Id. To support its understanding of the record, the majority provides specific examples of achievements in each subject matter from the fall of K.E.'s third-grade year to the end of her fourth-grade year,

-36-

including improvement in her reading fluency as well as in her ability to decode words, read clocks, count change, perform addition and subtraction, and skip-count. The majority concludes K.E.'s progress evidences "some educational benefit." I disagree. K.E. did make some progress in certain subjects and at certain times during the relevant years, but K.E. also regressed in some areas and overall her progress was trivial.

In 2005, K.E.'s performance was measured by the School District to be below grade-level academically, indicating K.E. had below-average cognitive abilities and working memory. Later, in 2006, K.E. was tested and fell below the levels measured in 2005. Through the end of her second-grade year, K.E. showed some progress in reading, but writing and spelling did not improve and K.E. still struggled with developing accurate sentences using correct capitalization and punctuation. By the end of second grade, K.E. was able to decode words (although the report does not indicate which words or what difficulty) with 85% accuracy. She was able to read short stories orally with 83% accuracy, and answer literal questions about reading passages with 95% accuracy. K.E. could read first-grade material at 46 words per minute with 95% accuracy. She mastered 92 of the first 100 Fry words (words identified by Edward Fry as the most used words in reading and writing). With regards to spelling, K.E. met her goal of spelling words from her spelling list with 98% accuracy, but did not meet her goal of spelling those words on tests with 85% accuracy. K.E. continued to struggle with capitalization, beginning her sentences with a capital letter only 60% of the time. K.E.'s progress report indicated from 2005 to 2006 K.E. made little progress in math as well as with her functional skills.

In the next year, from 2006 to 2007, K.E. went from reading consonant-vowel-consonant words with 95% accuracy to reading 5-6 letter words with sound blends with 90% accuracy. Her reading fluency also improved to reading a second-grade passage at 80 words per minute with 97% accuracy. Notably, the record does not indicate whether this reading pace is above- or below-average, but it is an improvement from her previous year. K.E. did fail to meet her goal of making logical inferences

based on passages she reads. The objective was carried over to the next year. K.E.'s ability to read Fry words increased as well. She could read the first 300 Fry words with as high as 88% accuracy by the end of third grade. However, K.E. regressed in spelling. She successfully spelled words from her list only 68% of the time, and completed her tests with only 60% accuracy. K.E. also failed to improve her capitalization and punctuation, still capitalizing her sentences only 60% of the time. In math, K.E. was able to read a clock to the half hour with 100% accuracy, and was able to read coins and determine their value. She was also able to perform one-digit subtraction with 100% accuracy.

Despite not having met several of her goals the previous year, in the fall of 2007, at the start of fourth grade, K.E.'s goals were increased. For example, K.E.'s new goals focused on writing paragraphs even though she could not write complete sentences correctly. In March 2008, K.E.'s progress report showed some progress in reading as well as some improvement in spelling, but still no progress in writing. She continued to have ongoing trouble with capitalization and punctuation, struggled with writing her own sentences, and had poorly organized paragraphs. The report found her progress in math to be minimal. Specifically, K.E. had improved her reading slightly, reading 5-6 letter words with sound blends with 95% accuracy. She was reading at a fourth-grade level at 54 words per minute and 90% accuracy, and she was reading 105 words per minute with third-grade reading material with 100% accuracy. K.E. did not make progress on her Fry words, still working to learn the third set of 100. In spelling K.E. ranged from an 83% to 87% success level on spelling lists and tests. In math, K.E. learned to tell time to the minute with 85% accuracy. She was also able to identify coins with 100% accuracy, counting change up to $2.00 with 83% accuracy. K.E. also began to perform skip counting and performed two-digit subtraction with 80% accuracy. Her classroom teacher indicated K.E. was struggling in all academic areas. At the end of the school year in 2008, K.E.'s reading performance had declined with the exception of a small increase in reading fluency and she made some progress in math, but there was no evidence of progress in writing.

In sum, each of these progress reports indicate small successes in various subjects throughout the years. However, when read as a whole, K.E.'s progress spanning the four relevant academic years was trivial. She progressed from single-digit to multi-digit addition and subtraction, learned to tell time and count change, improved reading fluency and pace but continued to lag significantly behind others, and struggled with spelling and writing.

The lack of progress to be gleaned from these reports is echoed by K.E.'s standardized testing scores. The school district conducted Northwest Evaluation Association ("NWEA") testing several times each year on both reading and math. The RIT score received on the NWEA test each year is intended to be compared to scores from previous years' testing to measure a student's progress. K.E.'s scores fluctuate dramatically. Beginning in the winter of K.E.'s second-grade year—the first point in time relevant to K.E.'s IDEA claims—K.E. had a math score of 180. This score dropped by the end of the school year to 173. K.E. then regressed over the summer to a 168, making it back up to a 177 by the spring of 2007, still several points below where she was in second grade. However, K.E. did make some progress in her fourth-grade year; she returned in the fall with a 170, but reached 187 by the spring of 2008, and in January 2009 received a 193. By comparison, however, the average student in K.E.'s grade started with a 186 in the winter of her second-grade year and rose to a 216 by January 2009. The progress in math seems as though it could be considered meaningful, but in contrast to her peers, K.E. regressed significantly. Her score in the winter of her second-grade year placed her in the 33rd percentile of her classmates. This percent dropped dramatically over the course of the next three years, placing her in the 6th percentile of her peers by the winter of her fifth-grade year.

K.E. demonstrated a similar progression in her RIT scores in reading, but did make some positive movement in her percentile rank, albeit a seemingly small improvement. In the winter of her second-grade year, K.E. scored a 160, which dropped to 155 by the end of the year, rose to 164 at the end of her third-grade year,

to 186 in fourth-grade, and finally reached a score of 191 by the winter of her fifth-grade year. However, like math, K.E. still lagged significantly behind her peers, whose average score was 210 by the winter of fifth grade. The statistics on K.E.'s annual progressions in reading indicated she progressed at a slower rate than did her peers, moving 2 points in her second-grade year, whereas her peers progressed 20 points, then 7 points in her third-grade year compared to her peers' 17 points, and finally 9 points in her fourth-grade year in contrast to her peers' 15 points. In terms of percentile, K.E. started in the 7th percentile in second grade, dropping to the 1st percentile by the end of the year, and then hovering between the 1st and 3rd percentile through the end of her fourth-grade year. K.E. did experience a significant leap from the fall of 2008 to January 2009—the fall semester of her fifth-grade year—climbing from the 3rd to the 9th percentile.

Relevantly, this information was available to the ALJ during the administrative hearing. In its findings, the ALJ referenced some of these scores and interpreted K.E.'s reading progress as "small," with the math scores showing "more progress." Regardless, the ALJ, being fully cognizant of the progress reports and the standardized testing, found K.E. did not make meaningful progress, "suffer[ing] a loss of educational benefit."

Recognizing full well I lack the "specialized knowledge and experience" of the ALJ in this "difficult question[] of educational policy," Rowley, 458 U.S. at 206, 208, I would grant due weight to the ALJ and agree K.E. failed to make sufficient progress. Essentially, as I review the record, K.E. did make some progress from second to fifth grade, but when considering her progress spanned four academic years, it becomes trivial at best. It seems this minimal progress indicates K.E. has an ability to learn and progress, yet she was unable to make any significant or meaningful strides. When viewing her progress reports in their entirety from second grade forward, it becomes evident K.E.'s ability to make any meaningful progress was stifled by her behavior. She was unable to focus on any one task for more than a few minutes, could not keep

-40-

track of homework assignments, and needed extra time to complete in-class tasks because she could not focus. In my view, the record provides evidence of only "de minimus academic and social progress" and "any slight benefit obtained was lost due to behavior problems that went unchecked and interfered with [K.E.'s] ability to obtain a benefit from [her] education." Neosho, 315 F.3d at 1029; see also Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S., 641 F.3d 996, 1004 (8th Cir. 2011) (concluding a student who had "consistently progressed under previous IEPs and . . . displayed no negative behaviors after the first, formal behavioral plan was implemented" received FAPE because her progress was not "illusory" nor was her "ability to progress undercut by unaddressed behavioral difficulties").

IV

In summary, from December 2005 until the time she filed her amended complaint for a due process hearing in 2009, K.E. suffered from known behavioral issues which significantly interfered with her ability to derive any meaningful educational benefit from her schooling. Despite knowing of K.E.'s behavioral challenges, I would conclude the School District failed to develop an IEP or implement a behavioral intervention plan capable of conferring some educational benefit upon her. I would further conclude the record establishes K.E. received no meaningful educational benefit during the relevant years of schooling, and I would thus hold K.E. was denied FAPE. I would therefore reverse the district court on this issue, and reinstate the ALJ's decision in part.

———————————————————