# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3104

_____

| | | |
|---|---|---|
| C.B., by and through his parents, B.B. and C.B., | * * * | |
| Appellant, | * * | |
| v. | * * * | Appeal from the United States District Court for the District of Minnesota. |
| Special School District No. 1, Minneapolis, Minnesota, | * * * | |
| Appellee. | * | |

_____

Submitted: May 13, 2010
Filed: April 21, 2011

_____

Before WOLLMAN, SMITH, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

C.B. is a child with a learning disability who resides within the Special School District No. 1 ("School District") in Minneapolis, Minnesota. C.B. and his parents allege that the School District violated his rights under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, by denying him a free appropriate public education to which he is entitled under the statute. C.B. transferred to a private educational institution, and he and his parents claim that they are entitled to reimbursement from the School District for one year of private tuition.

The district court ruled that the School District had failed to provide a free appropriate public education to C.B., but granted summary judgment in favor of the School District on the ground that C.B. and his parents were not entitled to reimbursement for private tuition. C.B. and his parents appeal. We reverse and remand for further proceedings.

I.

C.B. began kindergarten in 2002 at Hale Elementary School, a public school in Minneapolis for students in kindergarten through fourth grade. Within weeks of his enrollment, C.B.'s teacher noticed that he did not know many letters and sounds and was making slow progress in reading. C.B.'s mother also recognized her son's difficulty and expressed concern to his teacher that C.B. might be dyslexic.

By the time C.B. reached first grade, the School District determined that a special education evaluation was necessary. As part of the evaluation, C.B. took the Woodcock-Johnson III Achievement Test and placed in just the first percentile for reading skills. C.B. was diagnosed with a learning disability in reading and writing, and the School District determined that he was eligible for special education services.

The School District assembled a team of teachers and other officials qualified in special education who developed an individualized educational program ("IEP") for C.B. in January 2004, in accordance with the requirements of the IDEA. *See* 20 U.S.C. § 1414(d). The IEP set an annual goal to "increase his reading skills from a readiness level to a first grade level." C.B. was placed in a regular classroom, but he was also provided with thirty minutes of special reading instruction per day in a group setting.

At the time of the initial IEP, C.B. could read first grade material at a rate of three words per minute. C.B.'s measured reading rate increased to thirteen words per

minute by the end of the school year, but remained far below the sixty words per minute expected of students finishing first grade. The School District characterized C.B.'s progress in a June 2004 report as "slight."

The School District formulated C.B.'s second grade IEP in September 2004, and reiterated the goal of the initial IEP to "increase his reading skills . . . to a first grade level." Periodic evaluations continued to indicate "slight progress" in reading, but by the end of second grade, C.B.'s reading rate for first grade material was still far short of expectations. Records from C.B.'s third grade year exhibit few changes. The annual reading skills goal in his third grade IEP was the same as in prior years, but the District determined that an additional sixty minutes per week of special education in writing were appropriate. Periodic reports showed the same "slight progress," and testing at the end of third grade indicated a reading rate of thirty-two words per minute.

During the summer between third and fourth grade, C.B.'s special education instructor at Hale, Lynda Kelley, invited him to attend a program in which the Orton-Gillingham reading method would be used. This program was not sponsored by the School District. After a total of nine one-hour sessions, Kelley reported significant increases in C.B.'s reading and spelling scores, and noted that the intervention was more successful than any she had used.

By the time C.B. started fourth grade, however, much of the progress he made during the summer sessions had been lost. Kelley attributed this setback to a lack of continuous instruction. Concerned about C.B.'s regression, Kelley recommended that the student's three-year special education re-evaluation be conducted in October 2006, three months earlier than scheduled. The evaluation showed that C.B.'s response to prior interventions was "[i]nadequate," and that he was "severely underachieving" in reading and writing. On one broad measure of reading ability on the Woodcock-Johnson III test, for example, C.B.'s scores declined to the 0.10

percentile. The evaluation also noted a "severe discrepancy" between C.B.'s intellectual ability, which measured in the "average range," and his underachievement in reading.

Following the re-evaluation, team members met to prepare an IEP for C.B.'s fourth grade year. Notes from this meeting indicate that C.B. was socialized and well behaved, but he continued to struggle with word recognition. According to Kelley, District officials discussed with C.B.'s mother the possibility of transferring her son to another public school in Minneapolis that offered the Coordinated Learning for Academic and Social Success ("CLASS") program. The CLASS program is designed to help students with disabilities, including secondary behavioral problems, who are in need of intensive special education services. One teacher is assigned to every twelve to fifteen students in the program, and more than sixty percent of each school day is devoted to specialized instruction focusing on basic academic, social, and problem-solving skills. C.B.'s mother was not interested in the CLASS program at that time because she was concerned that such a move would hurt her son's self-esteem and social skills. Neither the IEP conference notes nor the fourth grade IEP reference the CLASS program.

The annual reading goal established in C.B.'s fourth grade IEP was to "increase his reading skills from a beginning first grade level, to an end of first grade level." The School District increased his special reading instruction to sixty minutes per day. During the academic year, one of C.B.'s teachers expressed concern about the student's inability to focus in class, and recommended to C.B.'s mother that she look into Groves Academy as an alternative placement. Groves is a private school in St. Louis Park, Minnesota, that specializes in educating children with learning disabilities. By the end of fourth grade, C.B.'s reading level was less than what he had achieved the previous summer, and far below the fluency expected of a student at the end of fourth grade.

In the fall of 2007, C.B. began attending fifth grade at Field Middle School in Minneapolis, another public school near the student's home. An evaluation at the beginning of the school year indicated that C.B.'s reading fluency had again decreased over the summer. Members of the IEP team met in September 2007 to create a new IEP, and again discussed the CLASS program. Notes summarizing the IEP conference indicate that the CLASS program was one of three options reviewed with C.B.'s mother. C.B.'s mother was concerned that the CLASS program was designed for students with behavioral problems and would not be a good fit for her son. C.B.'s mother also wanted him to attend school with his friends, one of whom helped him with his homework by reading materials to him. Therefore, she agreed to an option proposed by the District that permitted C.B. to stay at Field.

C.B.'s fifth grade IEP acknowledged growing concern from his parents and teachers about his "slow progress" in reading, and set a goal to "increase his reading skills from a first grade level to a second grade level." A report at the end of fifth grade, however, indicated only "slight" and "moderate" progress, and C.B.'s reading fluency for second grade material was measured at fifty-five words per minute, well below the reading ability of his peers.

Because of their son's continued lack of progress, C.B.'s parents arranged for him to meet with Dr. Susan Storti, a neurocognitive psychologist and language specialist, in June 2008. Dr. Storti administered a series of cognitive and behavioral tests, including the Woodcock-Johnson III test, which indicated that C.B.'s reading skills remained in the first percentile. Dr. Storti concluded that C.B. presented with "average" intelligence and appeared to be a "positive and resilient young man." Dr. Storti diagnosed C.B. with an auditory processing disorder and severe dyslexia and dysgraphia. She advised C.B.'s parents to consider placing their son at Groves Academy.

C.B.'s mother then began the process of enrolling C.B. at Groves. In July 2008, C.B.'s parents notified the School District by letter of their intention to enroll C.B. at Groves and requested that the District pay his private school tuition. They stated in the letter that their decision to seek a private placement was based on the fact that their son's special education program "continues to remain the same with little change year after year to the goals and objectives." C.B.'s parents also noted the fact that their son had "made no demonstrable progress" in his years in Minneapolis public schools, and expressed their belief that he had not "been provided with the right interventions to address his disabilities."

The School District refused the request to pay C.B.'s private school tuition. The District stated that C.B. was making "slow but steady progress" in public school, and that the amount of special education services he received had increased every year to meet his needs. The District also said that it had suggested during C.B.'s fourth and fifth grade years that he enroll in the District's CLASS program for additional help with reading and writing, but that C.B.'s parents were not in favor of such a move.

Despite the School District's refusal to pay, C.B. enrolled at Groves Academy in the fall of 2008. The cost of tuition for the 2008-2009 school year, after accounting for a scholarship that C.B. received, was $6800.

In September 2008, C.B.'s parents requested an administrative hearing to review the School District's decision to deny reimbursement. *See* 20 U.S.C. § 1415(f)(1)(A). An administrative law judge ("ALJ") served as the independent hearing officer and held hearings in November 2008. C.B.'s mother, along with several teachers and specialists from the School District and from Groves, testified at those hearings. The ALJ also received extensive documentary evidence, including C.B.'s annual IEPs and evaluations. The ALJ determined that C.B. was entitled to reimbursement for the $6800 in tuition, because the School District had failed to

make available to C.B. a free appropriate public education ("FAPE") under the IDEA, and because Groves was an appropriate placement under the statute.

C.B. then brought an action in the district court, seeking attorney's fees and costs arising from the administrative hearing. The School District counterclaimed, challenging the decision of the ALJ, *see* 20 U.S.C. § 1415(i)(2), and both parties moved for summary judgment. The district court denied C.B.'s motion, granted the School District's motion, and reversed the ALJ's order granting reimbursement. *See C.B. v. Special Sch. Dist. No. 1*, 641 F. Supp. 2d 850, 854 (D. Minn. 2009).

The court agreed with the ALJ that the School District had failed to make available a FAPE for C.B., *id.* at 856, but determined that Groves was not an "appropriate placement" under the IDEA, and that C.B.'s family was therefore not entitled to reimbursement for private school tuition. *Id.* at 856-57. The court reasoned that a primary objective of the IDEA is to educate children with disabilities in the "[l]east restrictive environment," *see* 20 U.S.C. § 1412(a)(5), and that such children "must be educated in a classroom along with children who are not disabled to the maximum extent possible." *C.B.*, 641 F. Supp. 2d at 856 (internal quotation omitted). Because nearly all of the students at Groves have learning disabilities and receive special education services, the court found that Groves was a segregated learning environment. The court further determined that C.B.'s disability could be addressed adequately in a less restrictive public school setting, because the CLASS program in the public schools offered educational services similar to Groves in a less restrictive environment. The court thus concluded that "Groves is not an appropriate placement for C.B. because it does not offer him an education in the least restrictive environment." *Id.*

II.

A.

C.B. and his parents challenge the district court's decision to set aside the decision of the hearing officer to award reimbursement of his private school tuition for the 2008-2009 school year. To evaluate this contention, it is helpful first to review the basic statutory framework, as set forth in the governing statutes and decisions of the Supreme Court.

The IDEA provides that a local educational agency that receives federal funds shall establish procedures "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a). These procedures must include an opportunity for any party to make a complaint with respect to the provision of a free appropriate public education to a child with disabilities. *Id.* § 1415(b)(6). When parents file such a complaint, they are entitled to an "impartial due process hearing" to be conducted by the local educational agency or the state educational agency. *Id.* § 1415(f). A hearing officer presides and makes "a determination of whether the child received a free appropriate public education." *Id.* § 1415(f)(3)(E)(i).

Any party aggrieved by the decision of a hearing officer has a right to bring a civil action in a federal district court. *Id.* § 1415(i)(2)(A). The court in such an action is directed to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). In *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985), the Supreme Court held that a federal court's authority to grant "appropriate" relief includes "the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper

-8-

under the Act." *Id.* at 369. The original version of § 1415 did not address the authority of hearing officers to order reimbursement, but the Supreme Court later stated in *Forest Grove School District v. T.A.*, 129 S. Ct. 2484 (2009), that *Burlington* "interpreted § 1415(i)(2)(C)(iii) to authorize hearing officers as well as courts to award reimbursement notwithstanding the provision's silence with regard to hearing officers." *Id.* at 2494 n.11.

In 1997, Congress amended the IDEA and included a subsection that directly addresses the availability of reimbursement for private school placement. *See* Individuals with Disabilities Education Act Amendments of 1997, Pub. L. No. 105-17, 111 Stat. 37, 63. That provision, now codified at 20 U.S.C. § 1412(a)(10)(C)(ii), states:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

In *Forest Grove*, the Supreme Court held that § 1412(a)(10)(C)(ii) did not alter the meaning of § 1415(i)(2)(C)(iii), as interpreted in *Burlington*, and that the IDEA authorizes reimbursement even in cases where a child had not previously received special education and related services through the public school. *See Forest Grove*, 129 S. Ct. at 2496. The Court also stated that by declining to alter § 1415(i)(2)(C)(iii) in 1997, Congress implicitly adopted the view that hearing officers are empowered to order reimbursement of expenditures on private special education in appropriate cases. *Id.* at 2494 n.11.

The Court in *Forest Grove* also addressed the requirements that must be met before a court or hearing officer may order reimbursement for private school placement. *Burlington* held that courts may grant reimbursement only when (1) a school district fails to provide a FAPE, and (2) the private-school placement is appropriate, that is, "proper under the Act." *Forest Grove*, 129 S. Ct. at 2493 n.9; *see Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). Although the 1997 amendment provides that a court or hearing officer may order reimbursement after finding that a public school district had not made a FAPE available in a timely manner, without any mention of a determination that the private-school placement was appropriate, 20 U.S.C. § 1412(a)(10)(C)(ii), the Court declined to read the statute as eliminating that second requirement. Instead, the Court opined that "[t]he latter requirement is essential to ensuring that reimbursement awards are granted only when such relief furthers the purposes of the Act," and inferred that the new provision was designed merely to "augment" § 1415(i)(2)(C)(iii) and *Burlington*, not to supplant the original provision. *Forest Grove*, 129 S. Ct. at 2493 & n.9. In other words, as we understand *Forest Grove*, parents of a child with a disability who previously received special education and related services must meet the twin requirements of *Burlington* to obtain reimbursement for expenditures on private special education, whether the parents invoke § 1412(a)(10)(C)(ii) or § 1415(i)(2)(C)(iii). *Accord id*. at 2499 n.2 (Souter, J., dissenting).

B.

The School District contends that C.B. and his parents fail to satisfy either requirement for reimbursement and urges that we affirm the judgment of the district court on either ground. We therefore consider the two requirements in turn, beginning with the matter of a free appropriate public education.

Whether a school district has made available a free appropriate public education is a mixed question of law and fact that we review *de novo*. *Fort Zumwalt*

-10-

*Sch. Dist. v. Clynes*, 119 F.3d 607, 611 (8th Cir. 1997). Judicial review of administrative proceedings under the IDEA is limited, because "judges are not trained educators." *E.S. v. Indep. Sch. Dist. No. 196*, 135 F.3d 566, 569 (8th Cir. 1998). A district court is to render an independent decision based on a preponderance of the evidence in the administrative record, but the court also must give "due weight" to the results of the administrative proceedings and not substitute its "own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982). We review the district court's decision *de novo*.

A primary purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A). A FAPE must be provided in accordance with the individualized educational program required under 20 U.S.C. § 1414(d). The IEP, in turn, is a "comprehensive statement of the educational needs of [the] handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Burlington*, 471 U.S. at 368. In developing a child's IEP each academic year, the school district must comply with the procedures set forth in the IDEA, and ensure that the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07.

The dispute here focuses on the "reasonably calculated" element of this requirement. What a school district must do to ensure that an IEP is reasonably calculated to provide educational benefit is determined on a case-by-case basis. The IDEA requires public school districts to educate "a wide spectrum of handicapped children," and the benefits obtainable by children at different ends of the spectrum will "differ dramatically." *Id.* at 202. The statute does not require a school district to "'maximize a student's potential or provide the best possible education at public expense.'" *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 (8th Cir. 2003) (quoting *Fort Zumwalt*, 119 F.3d at 612). Specific results are not required, *CJN v.*

-11-

*Minneapolis Pub. Sch.*, 323 F.3d 630, 642 (8th Cir. 2003), but a student's academic progress can be an "important factor" in determining whether an IEP complies with the IDEA. *See Rowley*, 458 U.S. at 203; *CJN*, 323 F.3d at 642. "The IDEA's requirements thus are satisfied when a school district provides individualized education and services sufficient to provide disabled children with 'some educational benefit.'" *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999) (quoting *Rowley*, 458 U.S. at 200); *see also Clark*, 315 F.3d at 1027.

Given the IDEA's two-year statute of limitations, *see* 20 U.S.C. § 1415(f)(3)(C), C.B. challenged the special education services provided by the School District in fourth and fifth grade. The hearing officer recognized the "very minimal" standard against which the District's performance was measured under *Rowley*, but nonetheless concluded that C.B. showed by a preponderance of the evidence that the District did not fashion an IEP that was reasonably calculated to provide some educational benefit. The hearing officer found that "[y]ear after year, the School District set trifling goals for the Student and failed to help him achieve even those insignificant goals." The record supports this conclusion.

The School District argues that it made a free appropriate public education available to C.B., because the IEPs were reasonably calculated to provide him with some educational benefit. The District contends that C.B.'s progress in reading is proof that the IEPs were sufficient to satisfy the statute. In particular, the District argues that the educational program it designed permitted C.B. to make progress in reading "at the same rate that his typical peers increased their skills." The District points out that C.B. maintained the same standard reading score on Woodcock-Johnson tests administered at the beginning of fourth grade and at the end of fifth grade when the student was evaluated by Dr. Storti. These results necessarily indicate, the District asserts, that C.B. made progress in reading during fourth and

-12-

fifth grade. The District further suggests that C.B.'s satisfactory performance in other academic subjects, like science and math, demonstrates his reading progress.

The District's argument is unconvincing in light of the evidence presented at the administrative hearing. As the ALJ noted, C.B.'s special education teacher at Hale, Lynda Kelley, acknowledged that the student's progress was not adequate. Kelley also confirmed that C.B.'s IEP team was aware that the gap in reading fluency between C.B. and his peers was increasing each year. Testing conducted upon C.B.'s entry at Groves in sixth grade confirmed that the student was reading at approximately a first grade level. Only when materials were read aloud to him did C.B.'s reading comprehension scores improve. Otherwise, his understanding of written materials generally measured in the single-digit percentiles.

There may be instances in which an educational program that results in such slight progress is sufficient to comply with the statute in light of the student's disability, but this is not such a case. C.B.'s intellectual ability consistently measured in the average range, and evaluations concluded that he was socialized, well behaved, and persistent when confronted with difficult tasks. *Cf. Fort Zumwalt*, 119 F.3d at 612. During the summer between the third and fourth grades, after working with a teacher for only nine hours with a new teaching method, C.B.'s reading scores improved significantly. Yet despite C.B.'s average intellectual ability, positive attitude, and willingness to work, the School District's educational program was not reasonably calculated to assist C.B. in making progress in reading during fourth and fifth grade.

We have no reason to quarrel with the hearing officer's observation that the staff of the School District "genuinely wanted to help the Student progress," but the record also supports the conclusion that the District failed to satisfy the substantive requirements of the IDEA. We therefore uphold the decisions of the hearing officer

and the district court that the School District failed to make available to C.B. a free appropriate public education during the fourth and fifth grades.

C.

Although the district court concluded that the School District failed to provide C.B. with a free appropriate public education, the court set aside the hearing officer's order for reimbursement of private tuition on the ground that private placement at Groves was not "appropriate" under the statute. The court observed that the IDEA expresses a preference for children with disabilities to be educated in the "[l]east restrictive environment," and provides that "[t]o the maximum extent appropriate," children with disabilities should be educated with children who are not disabled. 20 U.S.C. § 1412(a)(5)(A). It was undisputed that ninety percent of the students at Groves have IEPs, and that Groves therefore offered education in an environment that was largely restricted to students with disabilities. The district court found that the CLASS program available in the public schools "offered educational services similar to Groves but in a less restricted environment," that C.B. benefitted from the social opportunities available in the general educational environment, and that the evidence did not establish that C.B. required "a totally segregated, private school environment" to make educational progress. The court thus concluded that Groves was not an "appropriate" placement, because it did not offer C.B. an education in the least restrictive environment.

We conclude that the mainstreaming preference of the IDEA does not make Groves an inappropriate private placement under the circumstances. The statute calls for educating children with disabilities together with children who are not disabled "[t]o the maximum extent *appropriate*." *Id.* (emphasis added). Here, the School District failed to develop an IEP that made available a free appropriate public

-14-

education.  At that point, C.B.'s parents had a "right of unilateral withdrawal," *Florence Cnty.*, 510 U.S. at 13, and a right to reimbursement for private tuition, so long as the placement was "proper under the Act," *Burlington*, 471 U.S. at 369, and the award "furthers the purposes of the Act."  *Forest Grove*, 129 S. Ct. at 2493 n.9.

The overriding purpose of the Act is to provide an education for disabled children that is both free and appropriate.  The Act was designed, as the hearing officer noted, "to open the door of public education to handicapped children on appropriate terms."  *Rowley*, 458 U.S. at 192.  But once the School District failed to fashion an IEP that made available a free appropriate public education, it did not frustrate the purposes of the Act for C.B.'s parents to enroll him at Groves, where he could receive the educational benefit that was lacking in the public schools.

The parents were not required to allow the District another opportunity to try yet again with a different IEP that featured the CLASS program when the District did not propose that alternative in any of the IEPs that preceded C.B.'s withdrawal. Reimbursement for the costs of enrollment in a private school is authorized if the hearing officer finds that the District "had not made a free appropriate public education available to the child *in a timely manner* prior to that enrollment."  20 U.S.C. § 1412(a)(10)(C)(ii)(emphasis added).  A less restrictive environment is the ideal, but C.B.'s move to Groves after years of frustration in the public schools is a far cry from "the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes" that concerned Congress. *See Burlington*, 471 U.S. at 373.  We thus join the Third and Sixth Circuits in concluding that a private placement need not satisfy a least-restrictive environment requirement to be "proper" under the Act.  *See Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 83-84 (3d Cir. 1999); *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 399-400 (6th Cir. 1998).

Aside from the concern that Groves educates primarily children with disabilities, there is no doubt that it was a proper placement for C.B.  As the hearing officer summarized:

> Groves offers the Student teaching methods and programs that the School District has not provided.  In addition to these methods and programs, the ability to group and re-group students throughout the day to ensure reading skills are reinforced across subjects sets Grove[s] apart.  Moreover, the District's own teachers thought that Groves is an appropriate place for the Student.  His mother has seen an "explosion" of learning since the Student entered Groves.

We conclude that the placement at Groves was proper under the Act, and that reimbursement for tuition paid by C.B.'s parents to Groves for the 2008-2009 academic year is not precluded by the statute's preference for education in the least restrictive environment.[1]

*          *          *

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

_____

[1]C.B. and his parents also appeal the district court's denial of their motion to supplement the administrative record with additional information regarding the student's performance at Groves.  Because we conclude that the evidence in the record is sufficient to show that Groves was a proper placement, any error in denying the motion was harmless.