# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-1269

_____

Independent School District No. 283

*Plaintiff - Appellant*

v.

E.M.D.H., a minor, by and through her parents and next friends, L.H. and S.D.

*Defendant - Appellee*

------------------------------

Council of Parent Attorneys and Advocates, Inc.; Mid-Minnesota Legal Aid;
Minnesota Disability Law Center; National Alliance on Mental Illness Minnesota

*Amici on Behalf of Appellee(s)*

_____

No. 19-1336

_____

Independent School District No. 283

*Plaintiff - Appellee*

v.

E.M.D.H., a minor, by and through her parents and next friends, L.H. and S.D.

*Defendant - Appellant*

------------------------------

Council of Parent Attorneys and Advocates, Inc.; Mid-Minnesota Legal Aid;
Minnesota Disability Law Center; National Alliance on Mental Illness Minnesota

*Amici on Behalf of Appellant(s)*
_____

Appeals from United States District Court
for the District of Minnesota
_____

Submitted: March 10, 2020
Filed: June 3, 2020
_____

Before ERICKSON, GRASZ, and KOBES, Circuit Judges.
_____

ERICKSON, Circuit Judge.

E.M.D.H., a student in St. Louis Park, Minnesota, Independent School District No. 283 (the "District"), is plagued with various psychological disorders. E.M.D.H. and her parents, L.H. and S.D., filed a complaint with the Minnesota Department of Education, asserting the District's failure to classify E.M.D.H. as disabled denied her the right to a "free appropriate public education ("FAPE") under the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. After a seven-day evidentiary hearing, a state administrative law judge ("ALJ") concluded that the District's treatment of E.M.D.H. violated the IDEA and related state special-education laws. The District filed this action in federal court for judicial review of the ALJ's decision, as the IDEA authorizes. See 20 U.S.C. § 1415(i)(2). The district court denied the District's motion for judgment on the administrative record and granted, in part, E.M.D.H.'s motion for judgment on the record, modifying the award of compensatory education. We affirm, in part, and reverse, in part, reinstating the ALJ's award for compensatory education.

## I. Background

E.M.D.H. ("Student") carries a plethora of diagnoses: generalized anxiety disorder, school phobia, autism spectrum disorder (with unspecified obsessive-compulsive disorder traits), panic disorder with associated agoraphobia, attention deficit hyperactivity disorder ("ADHD"), and severe recurrent major depressive disorder. The Student's problems became manifest early in her life. By age four she was prone to tantrums and outbursts. By the second grade she was in therapy. Even though the Student had some attendance issues, she progressed through and excelled in elementary school.

Middle school proved more challenging. By the fall of her eighth-grade year, in 2014, the Student began to be more frequently absent from school, telling her mother that she was afraid to go. By the last quarter of eighth grade, the Student was consistently absent from school and was placed in a psychiatric day-treatment facility. The Student's teachers were aware that her absences were due to her mental-health issues and noted her schoolwork as incomplete rather than entering failing grades. The District dis-enrolled the Student in the spring of her eighth grade year.

Before the Student entered the ninth grade in the fall of 2015, her parents alerted the ninth-grade guidance counselor that the Student had not been present for the latter part of eighth grade due to anxiety and school phobia. Notwithstanding these past difficulties, the Student was enrolled in the ninth grade. The Student's attendance was inconsistent and then she quit going to school altogether and was admitted to a psychiatric facility for treatment. By November the District dis-enrolled her again.

In the spring of 2016, the District discussed evaluating the Student as a candidate for special education. The ninth-grade guidance counselor spoke to the Student's parents about an evaluation, leaving them with the impression that decisions related to special education were theirs to make, but noting that if the Student availed herself of

special-education opportunities she would not be allowed to remain in her honors classes. The parents did not request the evaluation and one was not undertaken by the District. The student was once again dis-enrolled that spring.

The Student spent most of the summer in 2016 at a treatment facility receiving therapy for her anxiety, depression, and ADHD. The staff at the facility noticed that while the Student struggled with increased sensory awareness she was able to manage her symptoms with assistance well enough to be gradually reintroduced to her academic work and daily routine. When the Student entered her tenth-grade year, the District developed a plan that allowed her extra time on assignments, adjustments in workload, breaks from class to visit the counseling office, and the use of a fidget spinner. However, even with these accommodations, the Student was unable to maintain consistent attendance. After the first six weeks, the Student attended almost no classes, resulting in another dis-enrollment by the District.

In January 2017 school staff met with the parents to reexamine the possibility of providing special education. Once again, the parents were told that if the Student was placed in special education, she would be removed from her honors classes, effectively placing her in course work that would not challenge or stimulate her intellectually. At the end of the first semester, the District had yet to perform a special-education evaluation. The Student attended only one day during the second semester. The District dis-enrolled her again in February.

In April 2017, the parents requested that the District evaluate the Student's eligibility for special education. The request came three days after the Student had been readmitted to a psychiatric facility. While at the facility, Dr. Denise K. Reese performed a comprehensive psychological evaluation of the Student, diagnosing her with major depressive disorder, autism spectrum disorder, ADHD, generalized anxiety disorder with panic and obsessive-compulsive-disorder features, and symptoms of borderline-personality disorder. Dr. Reese concluded that the Student's spate of mental

illnesses had "resulted in an inability to attend school, increasing social isolation, and continued need for intensive therapeutic treatment."

The Student's problems continued unabated into her junior year. She attended three partial days of the eleventh grade in the District's PAUSE program, which is designed for students with emotional and behavioral disorders. She ceased attending school after September 11, 2017. At this point, the Student had earned far less than half of the 46 credits necessary to graduate. Most of the Student's credits were from instruction she received at treatment facilities, with only two credits coming from regular District coursework.

It was not until November 2017 that the District provided the parents with a report evaluating the Student's eligibility for special education. The report concluded that the Student did not qualify. The District's conclusion prompted the parents to hire a team of doctors and other professionals to conduct an independent educational evaluation of the Student. The evaluation confirmed the Student's diagnoses and included a recommendation that she receive special education that would allow her to complete rigorous coursework while managing the symptoms that had made doing so difficult, if not impossible, in the past. The District rejected the recommendations, persisting in its initial assessment, which led to the parents filing a due-process complaint with the Minnesota Department of Education.

The complaint alleged that the District violated the IDEA and state law when it failed to identify the Student as eligible for special education services and did not provide her with such services. During the due-process hearing, testimony was taken from 20 witnesses, and almost 80 exhibits were received. The ALJ concluded the District acted unlawfully when it failed to: (1) identify the student as a child with a disability, (2) conduct an appropriate special-education evaluation, (3) find the Student qualified for special education, and (4) provide the Student a FAPE. The ALJ ordered:

(1)     the Student eligible for special education and related services;

(2)     the District to develop an Individualized Education Plan ("IEP") providing the Student with a FAPE;

(3)     the District to conduct quarterly meetings to consider changes to the IEP;

(4)     the District to reimburse the parents in an amount over $25,000 for past diagnostic and educational expenses they incurred; and

(5)     the District to pay for compensatory services in the form of private tutoring and the cost of attendance of the Student's psychiatrist and private tutor at IEP meetings.

In its appeal to the district court, the District requested leave to supplement the administrative record. The court denied the motion to supplement and affirmed the ALJ's decision, except for the order to pay for future private-tutoring services, which the district court reversed. The parties cross-appeal.

## II. Discussion

This case raises issues under both the IDEA and related state laws, which exist "to ensure that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). On appeal, the District asserts that the court abused its discretion by denying its request to supplement the administrative record. The District also asserts that the court and ALJ erred when they concluded that the District's special-education evaluation, eligibility determination, and child-find activities were flawed and inadequate. Both the District and the Student contest the court's remedial award. The District, on the one side, contends the Student is owed neither reimbursement of her expenses nor compensatory services while, on the other side, the Student contends that the court erred when it reversed the ALJ's award of compensatory private tutoring.

*A. Record Supplementation*

The District sought to supplement the administrative record by including two declarations from District staff about the progress the Student had made since the ALJ's original order. Although the IDEA allows a party to supplement the administrative record in the district court, 20 U.S.C. § 1415(i)(2)(C)(ii), "[r]endering a decision on the record compiled before the administrative agency . . . is the norm," W. Platte R-II Sch. Dist. v. Wilson ex rel. L.W., 439 F.3d 782, 785 (8th Cir. 2006). A party seeking to supplement the administrative record is required to demonstrate a "solid justification" to deviate from this norm. Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D., 88 F.3d 556, 560 (8th Cir. 1996) (quotation marks omitted). We review the district court's denial of the motion to supplement for an abuse of discretion. Indep. Sch. Dist. No. 283, 88 F.3d at 561.

The proposed supplementation elucidating how the Student was performing after the ALJ had entered his order and the District had implemented the Student's IEP is immaterial to the merits of the Student's due process complaint. The complaint alleged that the services the District offered the Student prior to the initiation of an administrative proceeding were insufficient. Evidence tending to show that the Student was making progress with the educational support she claims she was due all along would not have aided the determination of whether the ALJ properly found in favor of the Student. See W. Platte R-II Sch. Dist., 439 F.3d at 785 (affirming denial of supplementation where "additional evidence that the District attempted to provide related to the progress and status of [student] subsequent to the administrative hearing"); Indep. Sch. Dist. No. 283, 88 F.3d at 560–61 (same). The district court's decision denying supplementation was not an abuse of discretion. But even if it were, the abuse would have amounted to harmless error. See Fed. R. Civ. P. 61; Stringer v. St. James R-1 Sch. Dist., 446 F.3d 799, 805 (8th Cir. 2006).

*B. IDEA Issues*

We review the IDEA issues *de novo*, bearing in mind that under the Act the courts "render an independent decision based on a preponderance of the evidence in the administrative record." C.B. ex rel. B.B. v. Special Sch. Dist. No. 1, 636 F.3d 981, 988 (8th Cir. 2011). We give "'due weight' to the results of the administrative proceedings and [do] not substitute [our] 'own notions of sound educational policy for those of the school authorities which [we] review.'" Id. at 989 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 205–06 (1982)); Indep. Sch. Dist. No. 284 v. A.C. ex rel. C.C., 258 F.3d 769, 773–74 (8th Cir. 2001).

### 1. Eligibility Evaluation

Notably, Minnesota regulations require school districts to provide the student regular and special-education services, whether or not the student is disabled, when a student spends extended time at home or in a medical facility being treated for illness. Minn. Stat. § 125A.515; see also id. §§ 125A.15 and 125A.51. Nevertheless, once the parents requested the District evaluate the Student for a disability, the applicable regulations under the IDEA required the District to "conduct a full and individual evaluation . . . to determine if [she] is a child with a disability." 34 C.F.R. § 300.301(a)–(b). The District was also required to "ensure that . . . the evaluation [was] sufficiently comprehensive to identify all of the child's special education and related services needs." Id. § 300.304(c)(6).

Although the District contends that its evaluation met the regulation's requirements, its position cannot be squared with the requirement for a "full" and "sufficiently comprehensive" evaluation under the IDEA or Minnesota law. Id. §§ 300.301(a), 300.304(c)(6). Minnesota's special-education regulations require that when a student is evaluated for "emotional or behavioral disorders" and the "other health disabilities" categories of disability, the evaluation "must be supported by

current or existing data from," among other sources, a "functional behavioral assessment" and "systematic observations in the classroom or other learning environment by a licensed special education teacher." Minn. R. 3525.1329 subp. 1, 3 (emotional or behavioral disorders), id. 3525.1335 subp. 1, 3 (other health disabilities).

The District admits that it did not conduct either a functional behavioral assessment or make systematic observations of the Student. The District argues that it should be absolved of this duty because the Student was chronically absent, especially in the eleventh grade when the District's evaluation took place. We acknowledge that while the Student's absences might have made a comprehensive evaluation more difficult, the evidence does not support the conclusion that task was impossible to undertake. A functional behavioral assessment, which "identifies the antecedents, consequences, and reinforcers that maintain the behavior," does not depend on the Student's presence in the classroom. Minn. R. 3525.0210 subp. 22. And Minnesota's regulations make plain that "systematic observations" can be made both "in the classroom," and in "other learning environment[s]" as well. Id. at 3525.1329 subp. 3.

The record reflects that the District made no effort to assess the Student in her virtual classroom, at home, or in any one of the psychiatric facilities from which she earned school credits. The District's failure to avail itself of these possibilities or develop another way of gathering the necessary data is virtually conclusive evidence that the District's evaluation of the Student was insufficiently informed and legally deficient.

2.    Eligibility Determination

The District's evaluation, resting as it did on incomplete data, concluded that the Student is not eligible for special education. On appeal, the District stands by that conclusion and asserts that the determinations of the ALJ and district court to the

contrary are erroneous.  To be eligible for a FAPE that includes special education and related services, a student must be a "child with a disability."  20 U.S.C. §§ 1401(3), (9), 1414(d), 34 C.F.R. § 300.500(a), (c); see Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. Re-1, 137 S. Ct. 988, 993–94 (2017).  The IDEA defines a child with a disability as "a child . . . with," among other ailments, a "serious emotional disturbance" or "other health impairments . . . who, by reason thereof, needs special education and related services."[1]  20 U.S.C. § 1401(3).

A "serious emotional disturbance" is:

[A] condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

> (A)  An inability to learn that cannot be explained by intellectual, sensory, or health factors.

> (B)  An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

> (C)  Inappropriate types of behavior or feelings under normal circumstances.

> (D)  A general pervasive mood of unhappiness or depression.

> (E)  A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i).  An "other health impairment" means:

---

[1]"Serious emotional disturbance" and "other health impairments" are the federal analogs of Minnesota regulations denominating "emotional or behavioral disorders" and "other health disabilities," respectively.  Compare 34 C.F.R. § 300.8(c)(4)(i) (serious emotional disturbance), and id. § 300.8(c)(9) (other health impairment), with Minn. R. 3525.1329 (emotional behavioral disorders), and id. Minn. R. 3525.1335 (other health disabilities).

having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—

(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and

(ii) Adversely affects a child's educational performance.

Id. § 300.8(c)(9).

Under the District's analysis the Student's symptoms are simply insufficient to constitute a "serious emotional disturbance" or "other health impairments." However, the preponderance of the evidence in the administrative record indicates the Student has both conditions. For years the Student has suffered from a panoply of mental-health issues that have kept her in her bedroom, socially isolated, and terrified to attend school. Cf. Indep. Sch. Dist. No. 284, 258 F.3d at 776 (discussing eligibility for special education where the facts "show[ed] that [student's] truancy and defiance of authority result[ed] from a genuine emotional disturbance rather than from a purely moral failing"). The Student was absent from the classroom not as a result of "bad choices" causing her "to fail in school," for which the IDEA would provide no remedy, but rather as a consequence of her compromised mental health, a situation to which the IDEA applies. Id. at 775.

The administrative record demonstrates the Student has a serious emotional disturbance as she is unable "to build or maintain satisfactory interpersonal relationships with peers and teachers." 34 C.F.R. § 300.8(c)(4)(i)(B). The Student also displayed "[i]nappropriate types of behavior or feelings under normal circumstances" and has been living with a "general pervasive mood of unhappiness or depression." Id. § 300.8(c)(4)(i)(C), (D). The evidence in the record also shows that the Student suffers from "limited . . . vitality" and "a heightened alertness to

environmental stimuli" that are "due to chronic or acute health problems," including ADHD, all of which are symptoms of "other health impairments." Id. § 300.8(c)(9). The Student's absences from the classroom has put her well behind her peers in, among other things, earning the number of credits needed to graduate, and has therefore adversely affect[ed] her educational performance." Id. at 300.08(c)(9)(ii); see id. § 300.320(a)(2)(i)(A) (requiring special education be "designed to . . . enable the child to be involved in and make progress in the general education curriculum").

Despite this evidence, the District maintains that the Student is simply too intellectually gifted to qualify for special education. The District suggests the Student's high standardized test scores and her exceptional performance on the rare occasions she made it to class are strong indicators that there are no services it can provide that would improve her educational situation. The District confuses intellect for an education. See Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 13 (1993) ("IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free."). The IDEA guarantees disabled students access to the latter, no matter their innate intelligence. More practically, the positive results of the private tutoring and online learning indicate that the nearly three years where the Student foundered were not inevitable but the direct result of insufficient individualized attention under an appropriate IEP. The record demonstrates that the Student's intellect alone was insufficient for her to progress academically and that she was in need of special education and related services.

This Student may not present the paradigmatic case of a special-education student, but her situation does not vitiate the District's duty under the IDEA to provide her with a FAPE. "The IDEA requires public school districts to educate 'a wide spectrum of handicapped children,'" C.B. ex rel. B.B, 636 F.3d at 989 (quoting Rowley, 458 U.S. at 202), including those whose handicap is not cognitive. See Indep. Sch. Dist. No. 284, 258 F.3d at 777 ("If the problem prevents a disabled child from receiving educational benefit, then it should not matter that the problem is not cognitive

in nature or that it causes the child even more trouble outside the classroom than within it."). In Independent School District No. 284, for example, the court held that an educational placement in a residential facility pursuant to the IDEA was necessary for a student whose psychological infirmities contributed to her truancy and consequent lack of academic credit, even though she "ha[d] no learning disability" and "tests reveal[ed] [her] to be a shrewd problem solver." 258 F.3d at 777–78.

The Student is eligible for special education and a state-funded FAPE like every other "child with a disability." 20 U.S.C. § 1401(3). This "specially designed instruction," whether "conducted in the classroom, in the home, in hospitals and institutions, [or] in other settings," id. §1401(29), must be "reasonably calculated to enable [her] to make progress" and "appropriately ambitious in light of [her] circumstances," Endrew F. ex rel. Joseph F., 137 S. Ct. at 999–1000.

### 3. Child-Find Obligation

The ALJ and district court determined that the District breached its obligation to identify the Student by the spring of her eighth-grade year as a child eligible for special education. In addition to a FAPE, an essential aspect of the IDEA is the requirement that "children with disabilities . . . who are in need of special education and related services, are identified, located, and evaluated" by states. 20 U.S.C. § 1412(a)(3)(A); see Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 245 (2009) (describing this requirement as one of "paramount importance"). The District contends it had no duty to identify the Student as eligible for special education, at least not until the parents requested an evaluation in the spring of the Student's junior year. The District also contends that if such a duty existed the Student's claim is barred by the IDEA's two-year statute of limitations. We are not persuaded by the District's arguments.

As early as the spring of 2015 the District knew that the Student was missing significant time at school as a result of her mental-health issues. The dean of students at her middle school knew that the Student was receiving day treatment at a psychiatric facility. Confronted with this situation, the dean of students met with the Student's teachers to discuss the situation, focusing on how to grade her in her classes given her absences. Despite their knowledge that the Student was suffering from mental-health issues that impacted her ability to attend school, District staff did not refer the Student for a special-education evaluation because she had above-average intellectual ability. The District continued to embrace this decision until the parents requested an evaluation near the end of the Student's sophomore year. Even if the District was confronted with an unusual case marked by some confusion, in just the same way that the Student's eligibility for special education was not foreclosed by her intellect, the District's child-find obligation was not suspended because of her innate intelligence. The preponderance of the evidence supports the conclusion that the District breached its child-find obligation.

The District contends that even if it breached its child-find obligation, the breach occurred in the spring of 2015 and the IDEA's two-year statute of limitations had run by the time the Student's parents requested a due-process hearing on June 27, 2017. See 20 U.S.C. § 1415(f)(3)(C) ("A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint . . . .").[2] Assuming the parents knew or should have known they had a child-find claim when the Student was an eighth-grader, the District staff responsible for identifying the Student in the ninth and tenth grades likewise failed to fulfill their child-find obligation. In other words, the violation was not a single event like a decision to suspend or expel a student; instead the violation was repeated well into the limitations period. Cf. In re:

---

[2]Under these circumstances, we do not need to reach the issue of whether the IDEA's statute of limitations represents an occurrence rule or a discovery rule. See Avila v. Spokane Sch. Dist. 81, 852 F.3d 936, 941–42 (9th Cir. 2017); G.L. v. Ligonier Valley Sch. Dist. Auth., 802 F.3d 601, 611–13 (3d Cir. 2015).

Mirapex Prods. Liab. Litig., 912 F.3d 1129, 1134 (8th Cir. 2019) (noting that "breaches of continuing or recurring obligations" give rise to new claims with their own limitation periods). Any claim of a breach falling outside of the IDEA's two-year statute of limitations would be untimely. But, because of the District's continued violation of its child-find duty, at least some of the Student's claims of breach of that duty accrued within the applicable period of limitation.

### 4. Relief

Having found violations of the IDEA, we turn to the parties' dispute regarding the appropriate relief. The IDEA confers "broad discretion" upon hearing officers and courts to order remedies that are "'appropriate' in light of the purpose of the Act." Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 369 (1985); see also 20 U.S.C. § 1415(i)(2)(C)(3) ("[T]he court . . . basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."). The District asserts the court improperly ordered it to reimburse the parents the amount expended on: (1) Dr. Reese's comprehensive psychological evaluation, (2) the independent educational evaluation, and (3) and private educational services. The District also asserts the court erred when it ordered quarterly IEP meetings to take place until the Student graduates.

A review of the record demonstrates that the costs incurred as a result of Dr. Reese's work and that of other professionals hired by the parents would have been unnecessary but for the District's failure to timely identify and properly evaluate the Student as a child in need of special education. We conclude the award of these costs was within the broad discretion of the ALJ and district court. See Sch. Comm., 471 U.S. at 370 ("[W]e are confident that by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case."). Similarly, the parents' retention of a private tutor was the result of the District's inaction in the face of the Student's debilitating mental illness

and its adverse effects on her academic progress. Id. (noting that parents who pay for private education rather than suffer a school's insufficient IEP would score an "empty victory" if a court subsequently ruled that they were right but that the school was not obligated to reimburse them for the expenditures). Lastly, given the difficulties the District had correctly diagnosing the Student's situation, as well as its prolonged mishandling of her education, quarterly IEP meetings are appropriate in order to assure that the Student's education remains on track.

The Student challenges the district court's conclusion that the ALJ's award of compensatory education in the form of private tutoring was inappropriate. Although compensatory damages are unavailable through the IDEA, compensatory education is allowed. J.B. ex rel. Bailey v. Arvilla R-XIII Sch. Dist., 721 F.3d 588, 593 (8th Cir. 2013); see also Minn. Stat. § 125A.091, subd. 21 (describing compensatory educational services as any "direct and indirect special education and related services designed to address any loss of educational benefit that may have occurred" as the result of a FAPE denial). Here, the court reversed the ALJ's award for compensatory private tutoring because the record was silent as to whether the District could provide comparable services going forward. While we commend the court's impulse to limit the remedy and taxpayer expense, by doing so in this case the court failed to consider the purpose of a compensatory-education award: "imposing liability for compensatory educational services on the defendants merely requires them to belatedly pay expenses that they should have paid all along." Miener ex rel. Miener v. Missouri, 800 F.2d 749, 753 (8th Cir. 1986) (alterations and quotation marks omitted). Whether the District is able to provide the Student a FAPE prospectively is irrelevant to an award of compensatory education. Because of this backward-looking nature, the purpose of any compensatory-education award is restorative–and the damages are strictly limited to expenses necessarily incurred to put the Student in the education position she would have been had the District appropriately provided a FAPE. See Indep. Sch. Dist. No. 284, 258 F.3d at 774 (explaining that a present or future obligation to develop a new IEP is immaterial to the decision to award compensatory education). The administrative

record supports the ALJ's conclusion that the services of a private tutor are appropriate until the Student earns the credits expected of her same-age peers. We therefore reinstate the ALJ's award of these services, to be provided only so long as the Student suffers from a credit deficiency caused from the years she spent without a FAPE.

## III. Conclusion

We affirm, in part, and reverse, in part, reinstating the ALJ's award for compensatory education.

_____